[No. B093628. Second Dist., Div. Four. Nov. 25, 1996.]

TRW SPACE AND DEFENSE SECTOR et al., Plaintiffs and Respondents, v.
COUNTY OF LOS ANGELES, Defendant and Appellant.

1704

COUNSEL

De Witt W. Clinton, County Counsel, and Albert Ramseyer, Deputy County Counsel, for Defendant and Appellant.

Stephen Shane Stark, County Counsel (Santa Barbara) and Kevin E. Ready, Sr., Deputy County Counsel, as Amici Curiae on behalf of Defendant and Appellant.

Rodi, Pollock, Pettker, Galbraith & Phillips, John D. Cahill and Cris K. O'Neall for Plaintiffs and Respondents.

Bewley, Lassleben & Miller, Joseph A. Vinatieri and Jason C. De Mille as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

## VOGEL (C. S.), P. J.—

### INTRODUCTION

TRW Space and Defense Sector, a unit of TRW, Inc., and TRW Components International, Inc. (collectively, TRW), brought an action to recover ad valorem personal property taxes assessed and collected by the County of Los Angeles (County) for the tax years 1986 through 1989. The parties filed cross-motions for summary judgment. The trial court granted TRW's motion and denied County's motion. County appeals from the judgment awarding TRW a refund in excess of $2.1 million.

The primary issues presented by this appeal are County's power to tax a federal contractor such as TRW and whether the personal property which was the subject of County's assessment was the property of TRW or the property of the United States of America. If it is the latter, the property is immune from taxation. A minor issue raised by County is whether TRW should have exhausted its administrative remedies before the Los Angeles County Assessment Appeals Board before filing its tax refund suit in the superior court.

We reverse. We find that the property is properly subject to local taxation because it belongs to TRW, not the federal government. We also find that TRW was not required to first file its claim with the Los Angeles County Assessment Appeals Board.

### FACTUAL AND PROCEDURAL BACKGROUND

TRW owns and operates defense and research facilities in Los Angeles County. The principal business conducted at these facilities is the performance of contracts with agencies and departments of the United States of America.[1] The contracts involve the design and delivery of space and defense equipment and related services.

The property which TRW claims is immune from taxation includes consumable supplies and material (paper, pencils, office supplies, toilet paper, janitorial supplies, and TRW stationery) and low value office and plant equipment purchased for less than $1,000 (such as cabinets, desks, and chairs). For sake of simplicity, we will refer to these as the overhead

---

[1] Ninety-five percent of TRW's business is with the federal government.

property. TRW purchases these items on a recurring basis and usually in bulk. The overhead property at issue here is carried on TRW's books in segregated overhead accounts and allocated proportionately over all of TRW's government contracts.

TRW's government contracts fall into two categories. The first is a cost-reimbursement contract and the second is a fixed-price contract.

Under a cost-reimbursement contract, the government reimburses TRW for all costs necessarily incurred in the performance of the contract, plus an amount in excess of incurred costs (the fee). The costs are billed to the government when they are incurred.

Under the fixed-price contracts, TRW is paid a fixed amount for the service or the product which is the subject of the contract. Progress billings are issued during the performance of the fixed-price contracts based on a percentage of the costs incurred. About 75 percent of TRW's government contracts are cost-reimbursement contracts and the remainder are fixed-price contracts.

TRW's government contract work is subject to various federal regulations, including provisions of the Federal Acquisition Regulation (FAR), 48 Code of Federal Regulations, chapters 1-2 (1995), and the United States Government Cost Accounting Standards.

FAR has specific provisions for the passage of title of the product and its components to the federal government. These provisions are the predicate for TRW's fundamental contention that it has no taxable interest in the personal property assessed by County because that property belongs to the federal government, thereby rendering it immune from local taxation.

In the trial court proceedings, the parties did not produce copies of any of the contracts. Instead, the parties proceeded on the assumption that pursuant to various sections of FAR, particular title provisions were inserted into the contracts.

In TRW's complaint for refund of property taxes, it alleged that its cost-reimbursement contracts contained the title provision found in FAR section 52.245-5(c) and that its fixed-price contracts contained the title provision found in FAR section 52.232-16(d), and that the legal effect of the inclusions of these provisions was to immediately vest title to the overhead property in the federal government. We now set forth the text of those provisions.

FAR section 52.245-5(c), the title clause used in the cost-reimbursement contracts, provides as follows: "*Title.* (1) The Government shall retain title to all Government-furnished property. [¶(2) Title to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under this contract shall pass to and vest in the Government upon the vendor's delivery of such property. [¶(3) Title to all other property, the cost of which is reimbursable to the Contractor, shall pass to and vest in the Government upon— [¶ (i) Issuance of the property for use in contract performance; [¶ (ii) Commencement of processing of the property [f]or use in contract performance; or [¶ (iii) Reimbursement of the cost of the property by the Government, whichever occurs first."

FAR section 52.232-16(d), the title clause used in the fixed-price contracts, provides as follows:

"(d)   *Title.* (1) Title to the property described in this paragraph (d) shall vest in the Government. Vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

"(2)   *Property*, as used in this clause, includes all of the below-described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices.

"(i)   Parts, materials, inventories, and work in process;

"(ii)   Special tooling and special test equipment to which the Government is to acquire title under any other clause of this contract;

"(iii)   Nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, tape, gauges, test equipment, and other similar manufacturing aids, title to which would not be obtained as special tooling under subparagraph (ii) above; and

"(iv)   Drawings and technical data, to the extent the Contractor or subcontractors are required to deliver them to the Government by other clauses of this contract. . . ."

After discovery had been conducted, County moved for summary judgment on three grounds. The first was that TRW had failed to exhaust its administrative remedies. The second was that notwithstanding the contractual title provisions, TRW "possess[ed] the essential indicia of ownership"

of the property, rendering County's assessment proper. As for the contractual title provisions, County did not dispute the allegations in TRW's complaint about which provisions were in the contracts but instead asserted that title clauses were rebuttable and that County's showing of TRW's indicia of ownership had adequately rebutted the presumption(s) created by the title provisions. In particular, County asserted that TRW's failure to properly inventory or segregate the property demonstrated that TRW was the owner as opposed to the federal government. The third ground relied upon *Marine Midland Bank* v. *United States* (1982) 687 F.2d 395 [231 Ct. Cl. 495] and urged that at most the title provision(s) gave the federal government a lien on the property.

TRW opposed County's summary judgment motion, primarily urging that the title clauses in the various contracts vested title to the personalty in the federal government, thereby rendering the property immune from taxation. TRW asserted that FAR section 52.232-16 "appears in nearly all of TRW's fixed price Government contracts in issue in this proceeding" and that FAR section 52.245-5 "appears in all of TRW's cost-plus fee contracts with the Government in issue in this action."

Shortly after County moved for summary judgment, TRW did likewise. The primary contention in TRW's summary judgment motion was that the contractual title provisions vested title in the federal government. In its separate statement of undisputed facts, TRW cited the allegations in the verified complaint to support the assertion that particular title provisions were, in fact, in the subject contracts.

County's opposition to TRW's motion merely reiterated its earlier argument that at most the federal government possessed a lien, not title to the property. County's separate statement of undisputed material facts offered in opposition to TRW's summary judgment motion asserted that it was "undisputed" that pursuant to FAR section 52.245-5(c), the cost-plus-fee contracts "contain a clause which specifies that title to property acquired by TRW to perform the contract vests in the U.S. Government." However, the same statement asserted that it disputed the following proposition: "TRW's 'fixed price' contracts contain a 'progress payments' title passage clause which also vests title in property acquired by TRW to perform a contract for the U.S. Government (FAR 52.232-16(d))." To demonstrate the existence of this dispute, County cited subdivision (6) of the same federal regulation TRW relied upon to establish the proposition—FAR section 52.232-16(d)(6). That subdivision provides: "When the Contractor completes all of the obligations under this contract, including liquidation of all progress payments, title shall

vest in the Contractor for all property (or the proceeds thereof) not—[¶¶(i) Delivered to, and accepted by, the Government under this contract; or [¶¶(ii) Incorporated in supplies delivered to, and accepted by, the Government under this contract and to which title is vested in the Government under this clause."

The trial court relied, in part, upon these FAR's to decide that title to the overhead property vested in the federal government, thereby rendering it immune from taxation.

### DISCUSSION

In our discussion,[2] we first analyze the permissible scope of local taxation of a federal contractor and conclude that the assessed tax, if construed as an ad valorem property tax, can be constitutionally imposed if the overhead property belongs to TRW, not the federal government. In the second part of our discussion, we analyze the title provisions TRW relies upon for the proposition that title to the overhead property vested in the federal government and set forth our explanation for rejecting that proposition.

### A.  *The Power to Tax a Federal Contractor*

*Federal Case Law*

■  In the seminal decision of *M'Culloch* v. *The State of Maryland et al.* (1819) 17 U.S. 316 [4 L.Ed. 579], the United States Supreme Court set forth the governing constitutional principle that the properties, functions, and instrumentalities of the federal government are immune from taxation by state and local governments. Since that time, the question of the power of a state to tax property in possession of a federal contractor has been the subject of numerous decisions. We begin our analysis with *U.S.* v. *Allegheny County* (1944) 322 U.S. 174 [88 L.Ed. 1209, 64 S.Ct. 908] *(Allegheny)*.

---

[2]We quickly resolve County's procedural argument that TRW failed to exhaust its administrative remedies. The essence of TRW's claim for a tax refund was that the property was immune from local taxation because the property belonged to the federal government. The operative facts were undisputed; the dispute centered on the legal consequences which flowed from those facts. Resolution of that dispute did not fall within the jurisdiction of the Los Angeles County Assessment Appeals Board. (See rule 2 of the Rules of the Los Angeles County Assessment Appeals Board.) It therefore follows that TRW's failure to file an administrative appeal of the tax assessment did not preclude its state court action for a tax refund. (See, e.g., *Star-Kist Foods, Inc.* v. *Quinn* (1960) 54 Cal.2d 507, 590-511 [6 Cal.Rptr. 545, 354 P.2d 1]; *C.H.B. Foods, Inc.* v. *County of Los Angeles* (1987) 195 Cal.App.3d 821, 823-824 [241 Cal.Rptr. 18]; and *Yttrup Homes* v. *County of Sacramento* (1977) 73 Cal.App.3d 279, 282, fn. 1 [140 Cal.Rptr. 680].)

In *Allegheny*, Mesta, a Pennsylvania corporation, contracted with the federal government to manufacture heavy machinery. The federal government furnished part of the equipment Mesta required to perform the contracts. The equipment remained the property of the United States. The county imposed an ad valorem property tax on the equipment, the tax to be borne by Mesta. (322 U.S. at p. 184 [88 L.Ed. at pp. 1217-1218].) The court found the tax improper. It held: "Government-owned property, to the full extent of the Government's interest therein, is immune from taxation, either as against the Government itself or as against one who holds it as a bailee." (*Id.* at p. 189 [88 L.Ed. at p. 1220].) The court did note, however: "Mesta has some legal and beneficial interest in this property. It is a bailee for mutual benefit. Whether such a right of possession and use in view of all the circumstances could be taxed by appropriate proceedings we do not decide." (*Id.* at p. 186 [88 L.Ed. at p. 1219].)[3]

In a trilogy of cases decided in 1958, the United States Supreme Court resolved the issue it had not reached in *Allegheny*; it upheld imposition of a *use tax* on a private party using either real or personal property owned by the federal government. (*United States* v. *City of Detroit* (1958) 355 U.S. 466 [2 L.Ed.2d 424, 78 S.Ct. 474] [real property]; *U.S.* v. *Township of Muskegon* (1958) 355 U.S. 484 [2 L.Ed.2d 436, 78 S.Ct. 483] [real property]; and (*City of Detroit* v. *Murray Corp.* (1958) 355 U.S. 489 [2 L.Ed.2d 441, 78 S.Ct. 458] [personal property].) The use tax was distinguished from the tax found improper in *Allegheny*. The use tax was "imposed on a party using tax-exempt property for its own 'beneficial personal use' and 'advantage' " (*United States* v. *City of Detroit, supra,* 355 U.S. at p. 472 [2 L.Ed.2d at p. 428]) whereas in *Allegheny* the "tax was simply and forthrightly imposed on the [federal government's] property itself, not on the privilege of using or possessing it." (*Id.* at p. 471 [2 L.Ed.2d at p. 428].) A use tax is proper because "[l]awful possession of property is a valuable right when the possessor can use it for his own personal benefit." (*City of Detroit* v. *Murray Corp., supra,* 355 U.S. at p. 493 [2 L.Ed.2d at p. 446].) The use tax at issue was found to be constitutionally permissible because it "imposed a levy on a private party possessing government property which it was using or processing in the course of its own business" *and* because state law authorized taxation of a party in possession under those circumstances. (*Id.* at pp. 493,

---

[3]Later in the opinion, the court stated: "Actual possession and custody of Government property nearly always are in someone who is not himself the Government but acts in its behalf and for its purposes. He may be an officer, an agent, or a contractor. His personal advantages from the relationship by way of salary, profit, or beneficial personal use of the property may be taxed as we have held. But neither he nor the Government can be taxed for the Government's property interest." (*Allegheny, supra,* 322 U.S. at pp. 187-188 [88 L.Ed. at p. 1219].)

494 [2 L.Ed.2d at p. 446].)[4] As noted in a subsequent case, "[t]he use by the contractor [of federal property] for his own private ends—in connection with commercial activities carried on for profit—is a separate and distinct taxable activity." (*United States* v. *Boyd* (1964) 378 U.S. 39, 44 [12 L.Ed.2d 713, 718, 84 S.Ct. 1518].)

*California Case Law*

In *General Dynamics Corp.* v. *County of L. A.* (1958) 51 Cal.2d 59 [330 P.2d 794], the plaintiffs were defense contractors. Their contracts with the federal government were either fixed-price contracts or cost-plus-a-fixed-fee contracts. The provisions of these contracts vested title in the federal government to all of the personal property used in performing their contracts. Local government (the city and the county) imposed ad valorem property taxes on that personal property, claiming the contractors had taxable possessory interests in that federally owned personalty. The contractors paid the taxes and then sued for a refund, contending they had no taxable interest in the property. The trial court ruled in favor of the contractors. The government appealed.

While the case was pending in the California Supreme Court, the United States Supreme Court decided the trilogy of cases in which it held that local government could constitutionally tax a contractor's right to use personal or real property owned by the federal government. Those cases, however, were *not* dispositive of the government's appeal because the California Supreme Court found that no state statute authorized the imposition of a tax on the mere beneficial possession as opposed to outright ownership of personal property. Reviewing the pertinent state constitutional provisions, it concluded: "Under these provisions the Legislature may provide for the taxation of 'all forms of tangible personal property' and 'any legal or equitable interest therein.' [However], the Legislature has not provided for the taxation of limited interests in tangible personal property. It has not defined personal property as including a right to its possession as it has real property (see Rev. & Tax Code, §§ 104, 107), and this omission reflects not merely a lack of detail, but a consistent pattern of taxing tangible personal property as an entity or not at all. [¶] . . . [¶] . . . In construing ad valorem tax legislation, however, we cannot overlook the historical distinction between real and

[4] In *United States* v. *County of Fresno* (1977) 429 U.S. 452, 462-463, footnote 10 [50 L.Ed.2d 683, 692, 97 S.Ct. 699], the court made explicit *Allegheny's* limited precedential value. It wrote: "Insofar as *United States* v. *Allegheny County, supra,* holds that a tax measured by the value of Government-owned property may never be imposed on a private party who is using it, that decision has been overruled by *United States* v. *City of Detroit . . .* and its companion cases."

personal property that is reflected not only in the statutory provisions but in common understanding of what sort of interest in property is necessary to qualify as property itself within the meaning of tax statutes. . . . [Prior decisions] held . . . that possessory interests in tangible personal property were not taxable property." (*General Dynamics Corp.* v. *County of L.A.*, *supra*, 51 Cal.2d at pp. 64-66.) Averting to the right of local government to tax the right to use or possess federally owned property, the court stated: "To be valid a use or possession tax would have to apply to all tax exempt property so as not to discriminate against the private use or possession of property owned by the United States, and it is for the Legislature, not the court, to determine whether such a nondiscriminatory tax on possessory interests in tax exempt personal property should be adopted and to determine the measure of such a tax."[5] (51 Cal.2d at p. 67.)

One commentator gives the following history of the legislative response to the Supreme Court's holding that statutory authorization was required in order to levy a tax on the possession or use of federally owned personal property. "Los Angeles and San Diego Counties collaborated on a bill providing for an optional tax on the property, to be levied at the discretion of each county, and introduced the measure at the 1959 regular session of the California Legislature. The bill passed the Assembly but was killed in the Senate Revenue and Tax Committee through the vigorous opposition of the California Manufacturers Association, the California aircraft companies, and the United States Department of Defense." (Smith, *Taxing Possession of Federal Property* (1964) 4 Santa Clara Lawyer 166, 174, fn. omitted.)

Subsequent legislative efforts have been equally unavailing. One treatise states: "While periodic efforts have been made over the years to amend the law to permit the taxation of possessory interests in personal property, these have been consistently defeated, primarily on the ground that it would be injurious to the defense industry in California." (Ehrman & Flavin, Taxing Cal. Property (3d ed. 1991) Taxable Property—Personal Property, § 4:03, p. 3, fn. omitted.)

*Analysis*

The above precedents from the United States and California Supreme Courts establish three possible conclusions in this case. (1) If the property

---

[5]The court's reference to a "nondiscriminatory tax" is an acknowledgment of the principle that one limitation on imposing a use or beneficial possession tax on federally owned property is that such a tax cannot discriminate against either the federal government or those who deal with the federal government. (See, e.g., *United States* v. *City of Detroit, supra*, 355 U.S. at p. 473 [2 L.Ed.2d at p. 429], and *City of Detroit* v. *Murray Corp., supra*, 355 U.S. at p. 494 [2 L.Ed.2d at p. 446].)

belongs to the federal government, not to TRW, and the tax is construed as being an ad valorem property tax, the tax *cannot* be constitutionally imposed. In that case, the trial court properly granted judgment in favor of TRW. (2) If the property belongs to the federal government and not to TRW, and the tax is construed as being either a use tax or a tax on beneficial possession, the tax is constitutionally permissible but can only be imposed if state law permits the imposition of such a tax. Because there is no California statute authorizing such tax, the tax is improper and the trial court properly granted judgment to TRW on that basis. (3) If the property belongs to TRW and not to the federal government, an ad valorem property tax can be imposed and, on that basis, the trial court erred in granting summary judgment to TRW. This last possibility takes us to the next issue: Who, based upon the title provisions in the contracts, actually owns the property: the federal government or TRW?

### B. *The Contractual Title Provisions*

*FAR Section 52.245-5(c)*

FAR section 52.245-5(c) contains the title provision inserted in cost-reimbursement contracts. It vests title in the federal government to property purchased by the contractor if its cost is reimbursable to the contractor. TRW urged, and the trial court agreed, that this provision established federal ownership of the property in issue insofar as the cost-reimbursement contracts are concerned. As we shall now explain, this analysis is incorrect as a matter of law.

To understand the fatal flaw in this analysis, some background information on the internal structure of the Federal Acquisition Regulations System is in order. The first 51 parts constitute substantive regulatory law. In regard to the 51 parts setting forth substantive regulations, the opening section of each part defines its scope. The title provisions at issue in this case are found in part 52, entitled "Solicitation Provisions and Contract Clauses." As explained in FAR section 52.101, the numbering of the particular contract clause indicates which of the 51 substantive parts it is implementing. By way of example, FAR section 52.245-5 implements and is a subordinate clause of part 45, as indicated by the number "45" in the FAR itself.

Part 45 is entitled: "Government Property." FAR section 45.106(f)(1) contains the directive to insert the title clause set forth in FAR section 52.245-5 into a cost-reimbursement contract. We will therefore presume, as have the parties, that FAR section 52.245-5 appears in the contracts at issue. That, however, does not resolve the matter. FAR section 45.000 defines the scope of part 45 as follows: "This part prescribes policies and procedures for

providing Government property[6] to contractors, contractors' use and management of Government property, and reporting, redistributing, and disposing of contractor inventory. It does not apply . . . to property to which the Government has acquired a lien or title solely because of partial, advance, or progress payments; or to disposal of real property." This means that although the title clause found in FAR section 52.245-5 is in the cost-reimbursement contract, the clause does not apply to certain property—that for which the government has made partial, advance, or progress payments. That is, FAR section 52.245-5 cannot be the predicate for a claim of federal ownership of the property if the government was making payments to reimburse the contractor for the property.

This then brings us to the factual question of whether the overhead property subject to taxation is property for which the government has made "partial, advance, or progress payments." TRW itself has supplied the answer to that question. In the trial court, one of County's contentions in its summary judgment motion was that TRW had not complied with the requirements set forth in FAR sections 45.000 through 45.511 about proper management of government property in the hands of a private contractor. County urged that the failure to comply showed that TRW exercised the indicia of ownership so that it could be properly assessed as the true owner of the personalty. To defeat that claim, TRW urged that part 45 of the FAR did not even apply to the property at issue. TRW offered the declaration of Attorney John Chierichella, a lawyer experienced in the field of government contracts. The declaration averred, in pertinent part: "Subpart 45.5 does not apply 'to property to which the Government has acquired a lien or title solely because of partial, advance or progress payments.' This language appears at FAR 45.000 as well as 45.502(c)(2). The language clearly applies to progress payments under fixed price contracts. It is also my opinion that this language excepts compliance with Subpart 45.5 when the contractor has only been paid for a portion of its work on the contract, such as is the case with cost reimbursable contracts. This is implied by the term 'partial payments' in the cited FAR provisions. *Because virtually all of TRW's services for the Government are performed under either fixed price contracts with progress payments clauses or cost-reimbursable contracts, all of the subject*

---

[6]Government property is defined as "all property owned by or leased to the Government or acquired by the Government under the terms of the contract. It includes both Government-furnished property and contractor-acquired property as defined in this section." (FAR, § 45.101(a).) Contractor-acquired property "means property acquired or otherwise provided by the contractor for performing a contract and to which the Government has title." (*Ibid.*) Government-furnished property "means property in the possession of, or directly acquired by, the Government and subsequently made available to the contractor." (*Ibid.*)

*property appears to be exempt from Subpart 45.5's provisions."* (Italics added.)[7]

In light of the fact—established by TRW—that the property is the subject of partial payments and/or progress payments, we conclude that the property is *not* government property within the meaning of part 45. As defined by FAR section 45.101 (see fn. 6, *ante*), government property primarily consists of property furnished by the government as well as items supplied by the contractor which are direct costs named under the contract. It can also include property incorporated into the final product sent to the government. (See FAR, § 52.245-5(c)(3).) However, it does *not* include overhead property, the cost for which TRW is reimbursed through partial and/or progress payments. Consequently, the title clause in FAR section 52.245-5 does not vest title in the federal government and therefore cannot be relied upon to defeat County's tax assessment.

None of the arguments advanced by TRW to defeat this analysis is meritorious. The fact that County's separate statement of undisputed material facts, offered in opposition to TRW's summary judgment motion, asserted that it was "undisputed" that "TRW's 'cost-plus fee' contracts contain a clause which specifies that title to property acquired by TRW to perform the contract vests in the U.S. Government (FAR 52.245-5(c))," does not bar consideration of this claim. County's concession merely established that the title clause in FAR section 52.245-5(c) is part of the cost-reimbursement contracts. That concession, however, did not resolve the question of whether that clause vested title to the overhead property at issue in the federal government. That question requires analyzing whether the subject title clause *even applies to the overhead property* County has taxed. Construing that portion of the contract, in light of undisputed extrinsic evidence, is a question of law for our independent review. (*Appleton* v. *Waessil* (1994) 27 Cal.App.4th 551, 556 [32 Cal.Rptr.2d 676].) Stated another way, County's concession does not obviate the need for a court, be that the trial court or a reviewing court, to determine the applicability of the title clause to the overhead. As explained above, we have concluded the title clause does not apply to the overhead property.

TRW's argument that "FAR 29.303(c) specifically affirms the title vesting effect of the Government Property clauses" is also without merit. FAR

---

[7]In a similar vein, TRW's summary judgment motion argued: "Many of TRW's contracts are exempted from the requirements of FAR Subpart 45.5 . . . by the provisions of FAR 45.000 and 45.502(c)(2)." The footnote to this argument stated: "These FAR provisions do not require compliance where the contractor is only receiving progress or partial payments, which is the situation with most or all of TRW's Government contracts. Declaration of John W. Chierichella."

section 29.303 addresses the issue of immunity from state or local *sales or use taxes*. In that context, subdivision (c) states, in toto, with the italicized portion being the phrase upon which TRW relies, "*Frequently, property (including property acquired under the progress payments clause of fixed-price contracts or the Government property clause of cost-reimbursement contracts) owned by the Government is in the possession of a contractor or subcontractor*. Situations may arise in which States or localities assert the right to tax Government property directly or to tax the contractor's or subcontractor's possession of, interest in, or use of that property. In such cases, the contracting officer shall seek review and advice from the agency-designated counsel on the appropriate course of action." When placed in context, it is clear the emphasized language adds nothing to TRW's analysis. It merely points out that in some circumstances the federal government *can* obtain title to property through operation of various contractual provisions. But the italicized phrase begs the question of whether the overhead property *in this case* is property to which the federal government obtained title through the operation of a contractual title provision. That is, the section does not address the core issue in *this* case: Does the title provision in FAR section 52.245-5 vest title to the overhead property in the federal government?

TRW's argument that the provisions of FAR section 45.000 cannot be examined because the section itself is not incorporated into the contracts is borderline frivolous. In all likelihood, TRW should be estopped from making this argument because it relied, in part, upon this provision in the trial court to defeat County's argument that TRW's handling of the overhead property was inconsistent with federal regulations. In any event FAR section 45.000 is not the type of provision which would be incorporated into a contract. It is a provision which sets forth the scope of Part 45 and therefore aids in determining which portions of part 45, if any, are incorporated into a particular contract.

*FAR Section 52.232-16*

█ FAR section 32.502-4(a) requires the insertion of FAR section 52.232-16 in fixed-price contracts in which the government will make progress payments based on costs. Assuming this title clause is found in the fixed-price contracts, the issue is whether the clause vests title for the overhead property in the federal government as alleged by TRW and found by the trial court. As we shall explain, we find the clause does not have that legal effect.

FAR section 52.232.16(d) provides that title to property described in that paragraph vests in the federal government when it is allocable or properly

charged to the contract. The provision further provides that "[p]roperty, as used in this clause, includes all of the below-described items acquired . . . by the Contractor . . . ." Four separate categories of property are thereafter listed.[8] We set them forth below, in footnote 8.

The first issue is whether this listing is exclusive or illustrative. TRW has consistently urged, without citation to any authority, that the four categories of items are illustrative only. That is, TRW urges that insofar as the title clause is concerned, property is not limited to the items set forth in the four subparagraphs. We disagree. Nothing in the introductory language suggests that the listing is illustrative. Furthermore, the four subparagraphs contain a detailed listing of various categories of property. We therefore conclude that the listing is exclusive.

The next issue is whether the overhead property falls within any of the categories listed. TRW contends the overhead property is embraced within the category of "materials [and] inventories." We disagree. Taking all of the categories together, it is clear that property embraced within the meaning of this clause and therefore property belonging to the federal government is that which is used to produce the item contracted for. The listed items are used to manufacture the items, either as parts, instrumentalities or design and technical drawings pertinent to the production and operation of the product. This is in contrast to the overhead items at issue in this case, property which includes Post-Its, TRW stationery, toilet paper, and desks. None of these items is material or inventory used to produce the procured items: high-technology space and defense equipment. Instead, these items are the common staples of any ongoing business.

The apparent purpose of government title clauses is to protect the government's interest by giving it title to the asset to be acquired and the means by which the asset will be produced, operated or applied. (See FAR, § 32.503-14(a).) The federal government drafted the FAR. Presumably if it wanted to ensure that it acquired title to property such as the everyday overhead items at issue in this case, it would have included the category "overhead" in the categories listed in FAR section 52.232.16(d). It did not do so. Instead, it set

[8]The categories of property are: "(i) Parts, materials, inventories, and work in process; [¶](ii) Special tooling and special test equipment to which the Government is to acquire title under any other clause of this contract; [¶](iii) Nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment, and other similar manufacturing aids, title to which would not be obtained as special tooling under subparagraph (ii) above; and [¶](iv) Drawings and technical data, to the extent the Contractor or subcontractors are required to deliver them to the Government by other clauses of this contract." (FAR, § 52.232.16(d).)

forth categories of property which have one element in common: each is necessary to the production and operation of the subject matter of the contract. We therefore do not construe the phrase "materials [and] inventories" to include overhead property.[9] Consequently, we conclude, as a matter of law, that the federal government does not gain title to the overhead property because of the progress payments it makes to TRW in the fixed-price contracts.

To a certain extent, TRW suggests that this analysis is barred given the manner in which the action had been litigated in the trial court. A contextual analysis of the trial court proceedings refutes this suggestion.

TRW's separate statement of undisputed material facts offered in opposition to County's summary judgment motion asserted it was undisputed that the property at issue was either "material," "facilities," or "plant equipment." The evidence TRW cited to support this statement was the deposition testimony from Joseph Boerum, a TRW property systems manager. He stated that there were "five basic categories of property under the FAR" and then, in a conclusory fashion, testified that the overhead property in issue in the tax refund action would be considered either material, facilities, or plant equipment. The legal authority TRW offered to support its statement of undisputed material facts consisted solely of the definitions of property found in FAR sections 45.101(a) and 45.301.

In responding to TRW's statement of undisputed facts, County asserted that it was undisputed that the property at issue was considered to be "material," "facilities," or "plant equipment."

Contrary to TRW's suggestion, we do not believe that County's response now bars consideration of the contention that the overhead property is not "material" or "inventory" within the meaning of FAR section 52.232-16(d).

---

[9]In light of the above analysis, there is no need to adopt, as TRW suggests, the commonly understood definitions of the terms. The terms must be analyzed in the context in which they are used. For this reason, we reject TRW's argument that we should look to the definition of material found in FAR section 45.301 which includes "supplies that may be consumed in normal use in performing a contract." TRW's reliance upon this definition is unavailing because it takes the definition out of context. For one thing, part 45, of which 45.3 is a subpart, does not, as we have already explained, apply to property obtained via progress payments. FAR section 45.000 recites: "This part prescribes policies and procedures for providing Government property to contractors, contractors' use and management of Government property, and reporting, redistributing, and disposing of contractor inventory." Additionally, subpart 45.3, in which the definition is found, merely "prescribes policies and procedures for providing Government property to contractors" (FAR, § 45.300), a factual scenario completely different than that raised in this case. Simply stated, FAR section 45.301 has no application to this matter.

For one thing, the regulatory definitions TRW cited in its statement appear to be inapposite because part 45 does not apply to the overhead property in question (see fn. 9, *ante*). Furthermore, nothing in either TRW's separate statement or County's response to it indicates that the parties contemplated that they were addressing the definition of "material" or "inventory" as it appears in FAR section 52.232-16(d) or the legal ramifications of concluding that the overhead property was "material" or "inventory" within the meaning of FAR section 52.232-16(d). It would be the height of legal legerdemain to conclude that TRW's oblique references to several FAR provisions result in giving the words in issue (material and inventory) anything more than their plain meaning. The manner in which TRW posed the issue was neither clear nor unambiguous and its scope was not apparent. Consequently, County's response cannot reasonably be construed as an admission on its part that the overhead property is, in fact, government property.[10] As County has explained to this court: "Regarding the characterization of property in TRW's control, it was the county's intent to agree as to its general functional nature. [County's] impression of procurement law was that property could be viewed as falling within five classifications: facilities, material, special tooling, special test equipment, and agency provided property. [County] understood this to be analogous, for instance, to agreeing to the typing of certain property as land, fixtures, or personalty. By agreeing to these characterizations, it was never the County's intent to stipulate that the property so categorized was 'government property.' Were this the necessary corollary, [County] would respectfully ask that such concessions be withdrawn."

*FAR Section 52.245-2*

Alternatively, TRW relies upon FAR section 52.245-2 to urge that in the fixed-price contracts, the federal government has obtained title to the overhead property. Pursuant to FAR section 45.106(b), the contracting officer shall insert the title clause found in FAR section 52.245-2 in fixed-price contracts. FAR section 52.245-2(b)(4)(ii) provides that "[t]itle to all . . . material [other than that for which the Government will reimburse the contractor as a direct item of cost under the contract] shall pass to and vest in the Government upon— [¶](A) Issuance of the material for use in contract performance; [¶](B) Commencement of processing of the material or its use

---

[10]This case is readily distinguishable from *Hurley Construction Co.* v. *State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 540-541 [12 Cal.Rptr.2d 629], in which the appellate court held that by admitting a fact was undisputed, the party had waived any objections to the competency of the evidence which its opponent relied upon in its statement of undisputed facts. County is not objecting to the evidentiary basis of TRW's assertion of an undisputed fact (Boerum's testimony) but instead is clarifying the scope of its concession that the fact was undisputed.

in contract performance; or [¶](C) Reimbursement of the cost of the material by the Government, whichever occurs first."

TRW's reliance upon this title provision is misplaced for the same reason it erred in relying upon the title provision in FAR section 52.245-5 in the cost-reimbursement contracts: it simply does not apply to property, such as the overhead property, acquired via progress payments. (FAR, § 45.000.)

*FAR Section 52.216-7*

Lastly, TRW argues that FAR section 52.216-7 also demonstrates that title to the overhead property vests in the federal government. We disagree. FAR section 16.307(a) directs the contracting officer to insert the clause found in FAR section 52.216-7 in cost-reimbursement contracts. FAR section 52.216-7 sets forth the billing procedure by which the contractor can bill, and the federal government will reimburse, for expenses incurred in a cost-reimbursement contract. Nothing in this provision directly addresses the issue of title. The provision therefore adds nothing to TRW's argument.

*Aerospace Corp. v. State Bd. of Equalization (1990) 218 Cal.App.3d 1300*

TRW successfully convinced the trial court that a recent opinion of the Court of Appeal—*Aerospace Corp.* v. *State Bd. of Equalization* (1990) 218 Cal.App.3d 1300 [267 Cal.Rptr. 685] (*Aerospace*)—supported its contention that contractual title provisions created federal ownership of the overhead property. In fact, it was the rendering of that appellate decision which triggered TRW's claim for a tax refund. We find *Aerospace* to be distinguishable.

*Aerospace* involved, as does this case, overhead property purchased by a contractor to help it perform its contracts with the federal government. The contracts contained title clauses identical to those which TRW contends operate in this case in favor of the federal government. (218 Cal.App.3d at p. 1304.) There, however, the similarities between the two cases end. While in *Aerospace,* the contractor sued for refund of sales and use taxes paid on the overhead material, this case involves an ad valorem property tax based upon ownership. One of the primary issues in *Aerospace* was the validity of a regulation promulgated by the State Board of Equalization which essentially presumed that title to the overhead materials did not pass to the federal government. The Court of Appeal concluded: "Such presumption is contrary to the rule that title clauses of contracts with the federal government determine passage of title to materials used in performance of the contract to the government *for purposes of the sales and use tax law.*" (*Id.* at p. 1313, italics added.)

Putting aside the difference between the taxes involved in *Aerospace* and this case, we do not find the *Aerospace* analysis persuasive in its interpretation of the federal title provisions. Nowhere does the opinion discuss the issues raised in this case: (1) Do FAR sections 52.245-5 and 52.245-2 apply when the federal government pays for the indirect cost of the overhead items through progress and/or partial payments; and (2) Is overhead property material and/or inventory within the meaning of FAR section 52.232-16? Resolution of those questions is a prerequisite to determining the effect of the title clauses. The *Aerospace* court was apparently not presented with those issues and thus had no occasion to examine them. Nonetheless, that omission limits *Aerospace*'s precedential value in this matter.

### DISPOSITION

The judgment is reversed and the trial court is directed to enter summary judgment in favor of appellant County of Los Angeles in accord with the views expressed herein. Appellant to recover costs on appeal.

Epstein, J., and Aranda, J.,* concurred.

A petition for a rehearing was denied December 18, 1996, and respondents' petition for review by the Supreme Court was denied March 26, 1997. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.

---

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.