993 P.2d 1101

**MOTOROLA, INC., Plaintiff–Appellee,**

v.

**ARIZONA DEPARTMENT OF
REVENUE, Defendant–
Appellant.**

**No. 1 CA–TX 98–0009.**

Court of Appeals of Arizona,
Division 1, Department T.

July 13, 1999.

Janet A. Napolitano, Attorney General by Michael P. Worley, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellant.

Streich Lang, P.A. by Louis A. Stahl, Robert E. Miles, Lisa D. Duran, Phoenix, Attorneys for Plaintiff–Appellee.

## OPINION

LANKFORD, Judge.

¶ 1 The issue presented by this appeal is whether the use tax encompasses Motorola's use of certain items characterized as "indirect costs" of its federal contracts. We hold that it does not.

¶ 2 The Arizona Department of Revenue ("DOR") assessed $483,587 in delinquent use taxes against taxpayer Motorola, Inc. The assessment involved Motorola's purchases of overhead items allocated to federal contracts from April 1985 to August 1989. Motorola appealed, and the tax court granted summary judgment to Motorola. The court abated the assessment and ordered DOR to refund $473,713 in additional use taxes Motorola had paid on similar purchases from January 1986 to December 1991.

¶ 3 DOR's appeal to this Court asserts that Motorola's use tax liability extends to all tangible personal property that it purchased and used as overhead supplies and for which the United States Government reimbursed Motorola under various federal contracts. See Ariz.Rev.Stat. Ann. ("A.R.S.") § 42–5155 (Special Pamphlet 1998).[1]

### THE TAX

¶ 4 Arizona's use tax is an excise "on the storage, use or consumption in this state of tangible personal property purchased from a retailer...." A.R.S. § 42–5155(A).[2] The tax does not extend to items for sale. "Storage" is defined as "keeping or retaining tangible personal property purchased from a retailer for any purpose *except sale in the regular course of business* or subsequent use solely outside this state." A.R.S. § 42–5151(10) (Special Pamphlet 1998)[3] (emphasis

---

1. Formerly A.R.S. § 42–1408 (1991 & Supp. 1998), renumbered effective January 1, 1999. This opinion uses the current designations of the Arizona tax statutes.

2. This excise, referred to as the use tax, is imposed at the same rate as that provided for by the Arizona transaction privilege tax (the State "sales tax") on the business of selling tangible personal property at retail. See A.R.S. § 42–5155(C); see also A.R.S. § 42–5010(A)(1)(m) (Special Pamphlet 1998).

3. Formerly A.R.S. § 42–1401(6) (1990 & Supp. 1998).

added). Similarly, A.R.S. section 42–5151(12)[4] defines "[u]se or consumption" as "the exercise of any right or power over tangible personal property incidental to owning the property *except holding for sale or selling the property in the regular course of business*." (Emphasis added). "Sale" is defined as: *"[A]ny transfer of title or possession, or both ... in any manner or by any means whatever ... of tangible personal property* or other activities taxable under this chapter for a consideration." A.R.S. § 42–5001(13) (Special Pamphlet 1998) (emphasis added).[5]

## THE AUDIT AND APPEAL

¶ 5 DOR audited Motorola for the period April 1985 through August 1989. It assessed use taxes, and Motorola protested the assessment. Motorola's analysis of the assessment led it to request a refund for use taxes paid on certain overhead purchases during the period January 1986 through December 1991. DOR denied both Motorola's protest and its refund claim.

¶ 6 Motorola appealed to the State Board of Tax Appeals, which ruled for DOR. Motorola then appealed to the tax court. On cross-motions for summary judgment the tax court decided: "Because title to the overhead property was transferred to the government under both the cost-type and fixed price contracts at issue, this court concludes that Plaintiff is exempt from taxation under the use tax statute based on the resale exception." DOR timely appealed. We have jurisdiction pursuant to A.R.S. sections 12–2101(B) (1994), 12–120.04(G) (1992 & Supp. 1998), and 12–170(C) (1992).

## MOTOROLA'S GOVERNMENT CONTRACTS

¶ 7 To determine whether these items are subject to the use tax, we must consider Motorola's contracts with the government. Motorola's Government Electronics Group

purchased a large variety and quantity of tangible personal property for use in performing government contracts. Motorola incorporated some of it directly into identifiable goods that Motorola provided to the government.

¶ 8 But Motorola also employed items of tangible personal property in ways that could not be specifically attributed to its performance of any particular contract, federal or private. These items comprised Motorola's overhead and independent research and development ("IRAD") purchases. Motorola's costs of these purchases are "indirect costs," which are costs "not directly identified with a single, final cost objective, but identified with two or more final cost objectives or an intermediate cost objective." *See* 48 C.F.R. § 31.203(a) (1998). It is taxation of these indirect cost items that is disputed in this appeal.

¶ 9 The parties' stipulated statement of facts in the tax court detailed the nature of these items:

Generally, [Motorola's] overhead and IRAD [independent research and development] purchases include, but are not limited to, indirect costs such as parts (e.g. batteries, resistors and transistors), materials (e.g.metal, plastic) and inventories which are consumed in operations and are not incorporated into a final product delivered to a customer; equipment and materials (e.g. test tubes, chemicals) used in Motorola's laboratories; low value plant equipment (e.g. timers, meters, amplifiers), the cost of which is not capitalized; perishable tools (e.g. hammers, drills, screwdrivers, maintenance and repair supplies); office equipment (e.g. typewriter stands, card files), the cost of which is not capitalized; and office supplies (e.g. stationery, printed forms, paper clips). [Motorola's] overhead purchases also include items such as glue, solvents, nuts, bolts and screws,

---

**4.** Formerly A.R.S. § 42–1401(8) (1990 & Supp. 1998).

**5.** Formerly A.R.S. § 42–1301(13) (1991 & Supp. 1998). Because the transaction privilege and use taxes are complementary, see *People of Faith, Inc. v. Arizona Dep't of Revenue*, 161 Ariz. 514,

517, 779 P.2d 829, 832 (Tax 1989), we treat the definition of "sale" in the statutory provisions governing transaction privilege taxation as applicable to the use tax absent any indication that this would be contrary to the Legislature's intent.

which may be incorporated into a final product.

. . . .

[Motorola's] overhead and IRAD purchases also include employee retirement, recognition, incentive and birthday awards, pins, and plaques, including cakes and refreshments served at the occasions where these items are presented.

¶ 10 Although these items were not incorporated into identifiable goods sold to the government, Motorola was required to disclose to the government all of its anticipated direct and indirect costs for each government contract. *See* 48 C.F.R., subpart 30.2 (1998), Cost Accounting Standards ("CAS") Program Requirements. Because indirect costs, by definition, cannot be identified to particular contracts, Motorola was required to agree in advance on the percentages of Motorola's indirect costs allocable to each of Motorola's federal and private contracts. *See id.; see also* 48 C.F.R. § 31.203. These agreed allocation percentages were continually reviewed and adjusted based on experience.[6]

¶ 11 In compliance with the federal regulations, Motorola allocated its indirect costs among its federal and private contracts. The government reimbursed Motorola for all indirect costs allocated to Motorola's federal contracts.

## FIXED–PRICE AND COST TYPE CONTRACTS

¶ 12 This appeal also concerns whether Motorola sold these items to the government, because sales are excepted from the use tax. This issue in turn involves another aspect of Motorola's federal contracts: the legal consequences of Motorola's allocation of indirect costs to contracts classified either as "fixed-price-with-progress-payments" ("fixed-price") or "cost type." A fixed-price contract is one for which Motorola negotiated a fixed price with the government, and the government paid the fixed price through progress payments that were based on Motorola's costs. *See* 48 C.F.R. §§ 31.102 (1998), 32.502–4(a)

(1998). A cost type contract is one under which Motorola received its actual costs of performance plus a negotiated fee. Under each such contract, Motorola periodically billed its costs to the government. The government paid the billed costs plus a pro rata share of Motorola's negotiated fee.

## TITLE–PASSING CLAUSES

¶ 13 Significantly, both fixed-price and cost type contracts include a "title-passing clause." A cost type contract must include "the clause at [48 C.F.R. section] 52.245–5 [ (1998) ], Government Property (Cost–Reimbursement, Time–and–Material, or Labor–Hour Contracts)...." 48 C.F.R. § 45.106(f)(1) (1998). That clause provides in pertinent part:

(c) *Title.* (1) The Government shall retain title to all Government-furnished property.

(2) Title to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under this contract shall pass to and vest in the Government upon the vendor's delivery of such property.

(3) Title to all other property, the cost of which is reimbursable to the Contractor, shall pass to and vest in the Government upon—

(i) Issuance of the property for use in contract performance;

(ii) Commencement of processing of the property or use in contract performance; or

(iii) Reimbursement of the cost of the property by the Government, whichever occurs first.

(4) All Government-furnished property and all property acquired by the Contractor, title to which vests in the Government under this paragraph (collectively referred to as *Government property*), are subject to the provisions of this clause....

(d) *Use of Government property.* The Government property shall be used only

---

**6.** The regulations require government contractors like Motorola to negotiate annual agreements with the government establishing a ceiling for IRAD costs for the following fiscal year. The agreed ceiling is the maximum dollar amount of IRAD costs that may be allocated to the part of the company's operation to which the agreement applies. *See* 48 C.F.R. § 31.205–18 (1998).

for performing this contract, unless otherwise provided in this contract or approved by the Contracting Officer.

48 C.F.R. § 52.245–5(c) & (d).

¶ 14 A fixed-price contract must include "the clause at [48 C.F.R. section] 52.232–16 [(1998)], Progress Payments...." 48 C.F.R. § 32.502–4(a). That clause provides in pertinent part:

(d) *Title.* (1) Title to the property described in this paragraph (d) shall vest in the Government. Vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract.

(2) *Property,* as used in this clause, includes all of the below-described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices.

(i) Parts, materials, inventories, and work in process;

(ii) Special tooling and special test equipment to which the Government is to acquire title under any other clause of this contract;

(iii) Nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment, and other manufacturing aids, title to which would not be obtained as special tooling under subparagraph (ii) above; and

(iv) Drawings and technical data, to the extent the Contractor or subcontractors are required to deliver them to the Government by other clauses of this contract.

....

(6) When the Contractor completes all of the obligations under this contract, including liquidation of all progress payments, title shall vest in the Contractor for all property (or the proceeds thereof) not—

(i) Delivered to, and accepted by, the Government under this contract; or

(ii) Incorporated in supplies delivered to, and accepted by, the Government under this contract and to which title is vested in the Government under this clause.

48 C.F.R. § 52.232–16(d). All of Motorola's fixed-price and cost type contracts included the required title-passing provisions.

¶ 15 At the core of this appeal is this question: Did the title-passing provisions in Motorola's government contracts effect "sales" of the overhead items? If the items were sold, then they were not subject to the use tax. *See* A.R.S. §§ 42–5001(13) (sale), 42–5151(10) & (12) (store, use or consume defined), and 42–5155 (tax applies on items stored, used or consumed).

## PASSAGE OF TITLE

¶ 16 DOR argues that neither title-passing clause applied to Motorola's overhead purchases. DOR asserts that because possession of these items did not pass to the government, they were not sold. After examining both types of contracts, we conclude that because title passed, the items were sold and therefore were not subject to the use tax.

## . COST TYPE CONTRACTS

■ ¶ 17 We first consider the cost type contracts. DOR contends that the title-passing clause did not apply to the overhead items because these items were "contractor-furnished" and did not constitute "government property." DOR relies on a regulation, 48 C.F.R. section 45.102 (1998). That regulation provides that government policy requires contractors "to furnish all property necessary to perform Government contracts." DOR argues that such "contractor-furnished" property is not "government property" as defined by 48 C.F.R. section 45.101(a) (1998),[7] and therefore is not sold to the government. DOR also asserts that the title-passing clause cannot be interpreted to apply to contractor-furnished property because the insertion of the title-passing clause is mandated by regulation.

---

**7.** 48 C.F.R. section 45.101(a) defines "government property" as "all property owned by or

leased to the Government or acquired by the Government under the terms of the contract."

■ ¶ 18 DOR's construction of the title-passing provision is incorrect. First, while 48 C.F.R. section 45.102 implies a federal policy that contractors use as much contractor-furnished property as possible, it does not evidence the different policy for which DOR argues—that title to this property does not pass to the government. Instead, this regulation appears to intend to place the burden on government contractors, not the government, to marshall together the property necessary for performing their contracts.

¶ 19 Second, the rest of 48 C.F.R. section 45.102 contradicts DOR's interpretation. The subdivisions following this section impose on government contracting agencies various duties with respect to contractors who possess government property. One such duty "[r]equire[s] contractors to use Government property to the maximum practical extent in performing Government contracts...." 48 C.F.R. § 45.102(b). This conflicts with DOR's argument that the regulation expresses a policy limiting government contractors to using their own property in performing their contracts.

¶ 20 Third, DOR's analysis suffers from an internal defect of logic. It argues that the title-passing clause, including 48 C.F.R. section 52.245–5(c)(3)(iii), is categorically inapplicable to contractor-furnished property. However, this argument fails because 48 C.F.R. section 52.245–5(c)(2) and (3) by their terms operate only on property that the government does not already own. In other words, title cannot pass to the government if the property is the government's in the first place.

¶ 21 Nor are we persuaded by *TRW Space & Defense Sector v. County of Los Angeles,* 50 Cal.App.4th 1703, 58 Cal.Rptr.2d 602 (1996). In *TRW,* the court relied primarily on 48 C.F.R. section 45.000 in concluding that the title-passing clause could not be the "predicate for a claim of federal ownership of [overhead] property...." *See id.* at 609. The court then reasoned that 48 C.F.R., Part 45, including the title-passing clause, did not apply to property for which "the government was making payments to reimburse the contractor." *See id.*

¶ 22 This interpretation of 48 C.F.R. section 45.000 unfortunately fails to attend adequately to either the words of the regulation or those of the clause. In a cost type contract, the government reimburses the contractor for *every* item of property that the contractor procures for the job. This includes not only overhead items allocated to the contract, but also every item used specifically and exclusively for the contract. The inevitable conclusion from the *TRW* court's reasoning would be that *all* such items are outside the scope of Part 45. Part 45 would thus apply exclusively to items of property that the government already owns. It makes no sense to conclude that the only property to which title passes to the government is that which it already owns. Moreover, the provisions of Part 45 repeatedly contradict that proposition.

¶ 23 The *TRW* court also erred in asserting that title passes to the government "*solely because of* partial, advance, or progress payments." 58 Cal.Rptr.2d at 608 (emphasis added). The court overlooked that title also passes when the property is "issued for use in contract performance" or when the contractor starts processing the property or using it in performance of the contract. *See* 48 C.F.R. § 52.245–5(c)(3)(i) & (ii). Most of the overhead items involved here were as capable of passing to the government under the latter circumstances as under those listed in subsection (3)(iii).[8] Indeed, as DOR has obliquely recognized, and as the language of the regulation suggests, the events detailed in subsections (3)(i) through (iii) control only the timing of the passage of title to the government. In short, title to property does not pass "because of" the listed events; it passes "when" they occur.

■ ¶ 24 Finally, DOR contends that because overhead items cannot be specifically

---

8. For example, the items included perishable tools like hammers, drills, screwdrivers, maintenance and repair supplies; office equipment and supplies; glue, solvents, nuts, bolts and screws; laboratory equipment and materials; parts and materials like batteries, resistors, transistors, metal, and plastic that are consumed in operations; and non-capitalized plant equipment like timers, meters, and amplifiers.

identified to a single government contract, they are not government property and are not subject to the title-passing clause. The regulation DOR cites, 48 C.F.R. section 52.245–5(d), provides in part: "The Government property shall be used only for performing this contract, *unless otherwise provided in this contract or approved by the Contracting Officer.*" (Emphasis added). DOR fails to account for the italicized portion of subsection (d). Items need not be identifiable to a single contract to constitute government property. 48 C.F.R. section 45.505–3 (1998) refutes DOR's contention with language broad enough to include overhead items. The provision states in part:

(a) *General.* All Government material[9] furnished to the contractor, *as well as other material to which title has passed to the Government by reason of allocation from contractor-owned stores* or purchase by the contractor for direct charge to a Government contract *or otherwise,* shall be recorded in accordance with the contractor's property control system and the requirements of this section.

(b) *Consolidated stock record.* When a contractor has more than one Government contract under which Government material is provided, a consolidated record for materials may be authorized by the property administrator, *provided, the total quantity of any item is allocated to each contract by contract number and each requisition of material from contractor-owned stores is charged to the contract on which material is to be used.* The supporting document or issue slip shall show the contract number or equivalent code designation to which the issue is charged.

. . . .

(d) *Use of receipt and issue documents* . . . The property administrator may au-

thorize the contractor to maintain, in lieu of stock records, a file of appropriately cross-referenced documents evidencing receipt, issue, and use of Government-provided material that is issued for immediate consumption and is not entered in the inventory record as a matter of sound business practice. This method of control may be authorized for—

(1) *Material charged through overhead.* . . .

(Emphasis added). This language confirms our conclusion that the title-passing clause at 48 C.F.R. section 52.245–5 applies to overhead property. *Accord Aerospace Corp. v. State Bd. of Equalization,* 218 Cal.App.3d 1300, 267 Cal.Rptr. 685, 693 (1990).

**FIXED–PRICE CONTRACTS**

¶ 25 We now consider whether the other type of contract, fixed-price, transfers title to overhead items to the government. DOR contends that the pertinent title-passing clause, 48 C.F.R. section 52.232–16(d), does not apply to such items.

¶ 26 The analysis regarding fixed-price contracts differs from the cost type contracts. The provisions applicable to fixed-price contracts, unlike the provisions applicable to cost type contracts, do not define the terms "materials," "inventories," or "work in process." *See* 48 C.F.R. § 52.232–16(d)(2)(i); *see also generally* 48 C.F.R., Part 32, Contract Financing.

¶ 27 However, Motorola offered evidence of the meaning of the regulation. It provided the affidavit of former U.S. Defense Department accountant and auditor Louis P. Goldsman, C.P.A., concerning the customary usage of these terms in government cost accounting.[10] To the extent Mr. Goldsman's

---

**9.** "Material" is defined as:

[P]roperty that may be incorporated into or attached to a deliverable end item or that may be consumed or expended in performing a contract. It includes assemblies, components, parts, raw and processed materials, and *small tools and supplies that may be consumed in normal use in performing a contract.*

48 C.F.R. § 45.301 (1998) (emphasis added).

**10.** Mr. Goldsman was employed by the Defense Contract Audit Agency ("DCAA") of the Depart-

ment of Defense from 1967 to 1980, where he audited and supervised audits of companies performing under negotiated contracts awarded by the Department of Defense and other federal agencies. From 1976 to 1980, he was a Technical Program Specialist and staff advisor to the DCAA's Regional Director. In that capacity he was responsible for evaluating the performance of DCAA field audit offices. He also acted as Regional Cost Accounting Standards monitor responsible for identifying and resolving complex

affidavit includes competent evidence of the interpretations accorded by the Department of Defense to the terms in question, we may properly consider it. *See Romo v. Kirschner*, 181 Ariz. 239, 240, 889 P.2d 32, 33 (App.1995) (Though not binding on the courts, an agency's interpretation of its own regulations is generally entitled to great weight.); *Golden Eagle Distrib. v. Arizona Dep't of Econ. Sec.*, 180 Ariz. 565, 567, 885 P.2d 1130, 1132 (App.1994); *cf. Aerospace Corp.*, 267 Cal.Rptr. at 693–94 (relying on witness' experience-based testimony concerning usage of term "issuance for use" in 48 C.F.R. section 52–245–5(c)(3)(i)).

¶ 28 Mr. Goldsman's evidence is convincingly consistent with the regulatory structure and language. His affidavit avers familiarity with the content and operation of the standard title-passing clauses and with the government's contract policies and procedures. He attested to the regulatory treatment of overhead items like these involved here.

■ ¶ 29 Mr. Goldsman stated that pursuant to 48 C.F.R. section 52.232–16(d) and generally accepted accounting principles, title to such overhead items passes to the federal government. He also attested that the terms, "materials," "inventory," and "work in process" encompass indirect costs, including overhead and IRAD expenses. *See* 48 C.F.R. § 52.232–16(d)(2)(i). Other than DOR's own analyses of the pertinent FAR provisions, the record contains nothing contrary to Mr. Goldsman's averments. Against the detail and cohesiveness of Mr. Goldsman's explanation, DOR's assumption-based

interpretations of the terms "materials," "inventories," and "work in process" are not persuasive. The same is true of the similarly offhand construction of those terms pronounced by the California court in *TRW*.[11]

■ ¶ 30 DOR contends that only materials and supplies that are consumed in doing the physical work necessary to fulfill a contract constitute "materials." *TRW*, on which DOR relies, recognized that this notion is inherently counterintuitive and does not reflect practical reality. *See* 58 Cal.Rptr.2d at 611 n. 9 (deflecting defense contractor's reliance on definition of "material" in 48 C.F.R. section 45.301 on ground that definition did not apply to 48 C.F.R. section 52.232–16(d)). The term "materials" may include items consumed in the mental work that guides and underpins the physical work. Accordingly, we reject DOR's contention.

■ ¶ 31 We also reject DOR's argument that the "title-passing" provisions merely create a security interest. DOR's position is the minority view in the federal courts. *See McDonnell Douglas Corp. v. Director of Revenue*, 945 S.W.2d 437, 441 (Mo.1997) ("[S]ecurity interest theory ... has yet to be adopted as a majority view by the federal courts."). Like the court in *McDonnell Douglas*, we feel "no compulsion at this time to ignore the plain meaning of the title vesting provisions included in the federal contracts at issue in this case." *Id.* at 441.

¶ 32 DOR cites *Centric–Jones v. Town of Marana*, 188 Ariz. 464, 937 P.2d 654 (App. 1996), and argues that the arrangements be-

---

cost accounting problems under the statute that established the Cost Accounting Standards Board.

In 1980, Mr. Goldsman became employed by Price Waterhouse. Since 1985, he has been in charge of that firm's Government Contractor Consulting Services' West Coast Operations. He co-authored a text which is used in university government contracting programs.

11. The *TRW* court stated:

The apparent purpose of government title clauses is to protect the government's interest by giving it title to the asset to be acquired and the means by which the asset will be produced, operated or applied. (*See* FAR [Federal Acquisition Regulation, 48 C.F.R.] section 32.503–

14(a).) The federal government drafted the FAR. Presumably if it wanted to ensure that it acquired title to property such as the everyday overhead items at issue in this case, it would have included the category "overhead" in the categories listed in FAR section 52.232.16(d). It did not do so. Instead, it set forth categories of property which have one element in common: each is necessary to the production and operation of the subject matter of the contract. We therefore do not construe the phrase "materials [and] inventories" to include overhead property. Consequently, we conclude, as a matter of law, that the federal government does not gain title to the overhead property because of the progress payments to TRW in the fixed-price contracts.

50 Cal.App.4th 1703, 58 Cal.Rptr.2d at 611.

tween Motorola and the government equate to common commercial relationships in which the contractor seeks to recover his costs from his client. It asserts that under such arrangements, taxpayers do not genuinely resell items they use in their businesses.

¶ 33 *Centric–Jones* is inapposite. In *Centric–Jones*, a building contractor contended that the concrete piping and other items it purchased to build a pumping plant and switch yard under contract with the Central Arizona Project were entitled to Town of Marana deductions or exemptions from the town's transaction privilege tax for gross proceeds of certain qualifying "sales." We rejected the contractor's arguments, and concluded that the underlying construction contract was not a "contract to sell property" under the town ordinances and based on the Arizona Supreme Court's reasoning in *Duhame v. State Tax Comm'n*, 65 Ariz. 268, 278–79, 179 P.2d 252, 258–59 (1947), *overruled in part on other grounds by Valencia Energy Co. v. Arizona Dep't of Revenue*, 191 Ariz. 565, 576, 959 P.2d 1256, 1267 (1998). *See Centric–Jones*, 188 Ariz. at 478, 937 P.2d at 668. We determined that the contractor was not entitled to any deductions or exemptions because the contract at issue was one to " 'construct, alter, [or] repair' a 'structure, project, development, or improvement' " under town ordinances. *See id.* (citation omitted). We concluded that no "sale of tangible personal property" occurred because the building materials were no longer personalty once they "became part and parcel of [the] real estate [pumping station]." *See id.*

¶ 34 *Centric–Jones* has little bearing on this case. First, *Centric–Jones* examined the town of Marana's definition of "sale," and applied town ordinances in determining that a "sale" of tangible personal property did not take place. Moreover, DOR misconstrues this Court's holding in *Centric–Jones.* In *Centric–Jones*, we focused on the nature of the underlying contract in determining whether a "sale" occurred. We emphasized that the underlying contract was one for real estate rather than to sell property. The materials lost their personal property nature by incorporation into the real estate. Here,

the government's contract was one for personal property ("high tech components," as stated by DOR) as opposed to one for real property.

¶ 35 We decline to consider whether the presumption of intended change, see *Turf Paradise v. Arizona Dep't of Revenue*, 178 Ariz. 246, 248, 872 P.2d 201, 203 (Tax 1994), applies to the enactment of A.R.S. section 42–5159(A)(39) (Special Pamphlet 1998).[12] *See* 1994 Ariz. Sess. Laws 2315, 2318. Motorola does not rely on an exemption for the source of relief it seeks. Rather, Motorola contends that the overhead items are not taxable because they fall outside of the scope of the use tax since a "sale" occurs pursuant to A.R.S. section 42–5001(13). A.R.S. section 42–5001(13) defines the scope of the tax as opposed to creating an exemption. *Cf. Shamrock Foods Co. v. City of Phoenix*, 157 Ariz. 286, 288, 757 P.2d 90, 92 (1988) (City ordinance defining "sale," "define[d] the tax rather than creating an exemption from [the] tax."). Where property falls outside of the scope of the tax, exemption provisions like A.R.S. section 42–5159(A)(39) are irrelevant. *Cf. City of Phoenix v. Paper Distrib.*, 176 Ariz. 416, 419, 861 P.2d 701, 704 (Tax 1993), *aff'd in part, rev'd in part on other grounds*, 186 Ariz. 564, 925 P.2d 705 (App.1996).

¶ 36 Because we conclude that the IRAD and overhead items were not taxable under A.R.S. section 42–5155, we affirm the judgment of the tax court.

CONCURRING: CECIL B. PATTERSON, Jr., Judge, and PHILIP E. TOCI, Chief Judge.

---

**12.** Formerly A.R.S. § 42–1409(A)(40) (Supp. 1998).