[No. E029745. Fourth Dist., Div. Two. Feb. 26, 2002.]

HUGHES AIRCRAFT COMPANY, Plaintiff and Respondent, v.
COUNTY OF ORANGE, Defendant and Appellant.

**COUNSEL**

Laurence M. Watson, County Counsel, Jim Persinger and Ward Brady, Deputy County Counsel, for Defendant and Appellant.

Lloyd W. Pellman, County Counsel (Los Angeles) and Albert Ramseyer, Principal Deputy County Counsel, for County of Los Angeles as Amicus Curiae on behalf of Defendant and Appellant.

Stephen Shane Stark, County Counsel (Santa Barbara), Kevin E. Ready and Craig A. Smith, Deputy County Counsel, for Counties of Santa Barbara, Alameda, Butte, El Dorado, Fresno, Glenn, Kern and Solano, and County Assessors of the Counties of Santa Barbara, Los Angeles, San Diego and Santa Clara as Amici Curiae on behalf of Defendant and Appellant.

Bewley, Lassleben & Miller, Kevin P. Duthoy, Jeffrey S. Baird, Joseph A. Vinatieri and Jason C. Demille for Plaintiff and Respondent.

John B. Wyatt III for Boeing Company, Northrop Grumman Corporation, Science Applications International Corporation and TRW Space and Defense Sector as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**HOLLENHORST, Acting P. J.**—This case concerns the assessment of ad valorem taxes by the County of Orange (County) against the personal property, including manufacturing supplies, expensed equipment and office space partitions, used by Hughes Aircraft Company (Hughes), a defense contractor, in the performance of government contracts. We are asked to determine whether title to such property passes to the United States Government (Government) in accordance with the Federal Acquisition Regulation (FAR), 48 Code of Federal Regulations part 52.232-16 (1998), with respect to fixed-price Government contracts with progress payments, and 48 Code of Federal Regulations part 52.245-5 (2001),[1] with respect to cost-reimbursement Government contracts, such that, when in the possession of Hughes, the property is not subject to local taxation.

FACTS

Hughes is a defense contractor, which has performed multiple and various contracts for different Government agencies. In connection with its operations, Hughes operated facilities within the County for the years 1989 through 1995. During that time, Hughes maintained more than 100 separate contracts with the Government for the design and fabrication of high-tech electronic systems for the Department of Defense. Those Government contracts were subject to the FAR and the United States Cost Accounting Standards (CAS). The contracts at issue in this case were either "cost reimbursement" (§ 52.245-5(c)) or "fixed price" (§ 52.232-16(d)) contracts.

Cost-reimbursement contracts are Government contracts pursuant to which the Government reimburses Hughes for all costs necessarily and properly incurred in the performance of the contracts plus a fixed fee. (§§ 16.301-1, 16.301-2 & 16.306 (2001).) The costs include both direct costs charged to a particular contract and allocated indirect costs. Part 52.245-5(c) provides that title to any property acquired by Hughes in the performance of cost-reimbursement contracts passes to the Government at the time it is acquired. Such contracts are generally used when costs cannot be estimated with sufficient accuracy to use the alternative fixed-price contract with the contractor. (§ 16.301-2.)

---

[1] All further section references are to 48 Code of Federal Regulations unless otherwise indicated.

Fixed-price contracts are Government contracts under which the agreed consideration for contract completion is fixed. As stated, the fixed-price "qualifying" contracts involved in this case were financed by the Government under the progress payments clauses of FAR, part 52.232-16, pursuant to which the contractor issues periodic invoices based on a percentage of its projected costs incurred to date. Under the progress payments clauses, title to property acquired by the contractor for contract performance passes to the Government when the property is allocated or charged to the given contract. (§ 52.232-16(d).) Although the amounts of the progress payments are computed based upon a formula which takes into account costs incurred to date, they are not cost-reimbursement payments. Rather, the contractor assumes the risk of completion with no guarantee whatsoever that its actual costs will be recovered from the "progress payments" received. (§ 16.202-1.)

In the performance of its Government contracts, Hughes acquired certain supplies, expensed equipment and office partitions.[2] This property was purchased under indirect accounts, i.e., it was not charged to a particular Hughes contract, and consistent with the prescribed and applicable CAS and the FAR, was allocated among all of Hughes's Government contracts. Property purchased on such indirect accounts is often referred to as "overhead" property.

In the 1989-1990, 1990-1991, 1991-1992, 1992-1993, 1993-1994, and 1994-1995 tax years (1989-1995 tax years), the assessor for the County assessed all of the subject overhead property as Hughes's property, without regard to allocation between the qualifying contracts and the nonqualifying contracts. Hughes paid taxes on the overhead property and then, pursuant to Revenue and Taxation Code sections 1603 and 5097, timely filed applications for reduction of assessment and claims for refund for the 1989-1995 tax years with the County Assessment Appeals Board. Hughes contended

---

[2] "Supplies" includes materials consumed in the production process, such as welding supplies, plating compounds, abrasives, brushes, anodes, acids, sandpaper and emery cloth, as well as artist and drafting supplies, and general office supplies. "Expensed equipment" includes durable low-cost items of equipment purchased for general use with a life expectancy of less than 18 months, such as low-cost laboratory and test equipment, small tools, jigs, dies, molds, patterns, taps, gauges, and similar manufacturing aids, as well as drafting equipment, lamps, calculators and blackboards. "Partitions" consists of movable office space dividers used at Hughes's various business locations to establish work areas for performance of Hughes's contracts. All of the subject supplies, expensed equipment and partitions were accounted for by Hughes as overhead, i.e., as indirect cost items allocated among all of Hughes's then pending contracts, rather than directly to particular contracts. Pursuant to its contracts with the Government, Hughes was reimbursed by the Government for that portion of the supplies, expensed equipment and partitions used in the performance of the Government contracts. After completion of contract work, any remaining expensed equipment or partitions were sold by Hughes at bid sale, and the proceeds credited back to the Government.

that a portion of the taxes paid on the overhead property should be excluded from assessment because title resided with the Government. Hughes and the County have stipulated to the percentage of Hughes's costs to purchase the overhead property during the relevant years at each of its facilities, which costs were incurred in performing qualifying Government contracts. The amounts of tax in dispute for each tax year are as follows:

| Tax Year | Tax Amount |
|----------|------------|
| 1989-90 | $241,109 |
| 1990-91 | $224,737 |
| 1991-92 | $205,543 |
| 1992-93 | $175,199 |
| 1993-94 | $157,228 |
| 1994-95 | $148,830 |

After timely exhausting its administrative remedies in this matter, Hughes initiated this action on May 19, 1995, seeking a refund of ad valorem taxes paid to the County. Specifically, Hughes's complaint sought a recovery of $1,152,646 in taxes together with accrued interest. The matter was submitted on stipulated facts, exhibits, and the arguments of counsel. Counsel for Hughes cited to the case of *Aerospace Corp. v. State Bd. of Equalization* (1990) 218 Cal.App.3d 1300 [267 Cal.Rptr. 685] (*Aerospace*), while counsel for the County relied on *TRW Space & Defense Sector v. County of Los Angeles* (1996) 50 Cal.App.4th 1703 [58 Cal.Rptr.2d 602] (*TRW*).

After considering the matter, on December 17, 1997, the trial court issued a minute order wherein it stated: "This case came to trial at a time when there was no perfect binding precedent. Then came the anticipated guidance of the appellate ruling in [*TRW*]. Not surprisingly, a ruling there in favor of the County of Los Angeles led the County of Orange to insist that that decision 'is decisive on all issues presented by Hughes Aircraft Co. is [*sic*] the case before the Court.' This court has concluded otherwise, however, for two principal reasons. The first of these is item 3[3] in these parties' Stipulation of Facts relating to ownership of the subject property. That may be the most important fact in this case, and it is a notable distinction from

---

[3]"There appears on each of the Assessed Value Summaries a column entitled 'Qualifying Contract %.' HUGHES contends that these percentages truly and correctly reflect the percentage of its costs for supplies, equipment and partitions at each business location for each year, which were incurred in the performance of 'qualifying contracts.' 'Qualifying contracts' are contracts between HUGHES and the United States Government which contain a title clause passing title to materials, including the subject supplies, equipment and partitions, to the United States upon HUGHES' receipt thereof. Based upon the results of a previous State Board of Equalization sales tax audit which have been provided by HUGHES to the Assessor, the Assessor stipulates that the qualifying contract percentages for the years 1989-90, 1990-91, 1991-92, 1992-93, 1993-94 and 1994-95, shown on the Assessed Value Summaries, represent

the TRW situation. Second, the earlier opinion in [*Aerospace*] still seems to apply to the present situation and require judgment in favor of the plaintiff."

On February 23, 1998, judgment was entered for refund of taxes overpaid by Hughes in the sums of $241,109 for tax year 1989-1990; $224,737 for 1990-1991; $205,543 for 1991-1992; $175,199 for 1992-1993; $157,228 for 1993-1994, and $148,830 for 1994-1995, plus interest on such sums. This appeal followed.

## STANDARD OF REVIEW

The evidence before the trial court came from the parties' stipulation of facts. The parties agree that the issues in this case are purely legal issues subject to de novo review. (*Shuwa Investments Corp. v. County of Los Angeles* (1991) 1 Cal.App.4th 1635, 1644 [2 Cal.Rptr.2d 783].)

## DISCUSSION

■■■ Because this case involves the assessment of ad valorem taxes, resolution of the issues raised by the parties depends on the answer to the question: Do the title provisions in parts 52.245-5 and 52.232-16 vest title to Hughes's overhead property in the Government? In order to answer this question, we consider the power of a state to tax a federal contractor, the facts of this case, the FAR, and applicable case law.

A. *The State's Power to Tax a Federal Contractor.*

■■■ Whether a state has the power to tax a federal contractor has been adequately discussed in *TRW, supra,* 50 Cal.App.4th 1703, 1710-1714. Citing to *General Dynamics Corp. v. County of L. A.* (1958) 51 Cal.2d 59 [330 P.2d 794], the *TRW* court concluded that: "(1) [i]f the property belongs to the federal government, not to [the contractor], and the tax is construed as being an ad valorem property tax, the tax *cannot* be constitutionally imposed[;] (2) [i]f the property belongs to the federal government and not to [the contractor], and the tax is construed as being either a use tax or a tax on beneficial possession, the tax is constitutionally permissible but can only be imposed if state law permits the imposition of such a tax[; and] (3) [i]f the property belongs to [the contractor] and not to the federal government, an ad valorem property tax can be imposed . . . ." (*TRW, supra,* 50 Cal.App.4th 1703, 1713-1714.) We agree with the *TRW* court's conclusion and now turn to the question of who has title to Hughes's overhead property.

true and correct allocations of the subject supplies, equipment and partitions, between qualifying and non-qualifying contracts."

B. *Facts.*

According to the parties' stipulation, the overhead property in this case was consumed or used in the performance of qualifying Government contracts. The overhead property was described as consisting of supplies, expensed equipment and partitions. "Supplies" includes materials consumed in the production process, such as welding supplies, plating compounds, abrasives, brushes, anodes, acids, sandpaper and emery cloth, as well as artist and drafting supplies, and general office supplies. "Expensed equipment" includes durable low-cost items of equipment purchased for general use with a life expectancy of less than 18 months, such as low-cost laboratory and test equipment, small tools, jigs, dies, molds, patterns, taps, gauges, and similar manufacturing aids, as well as drafting equipment, lamps, calculators and blackboards. "Partitions" consists of movable office space dividers used at Hughes's various business locations to establish work areas for performance of Hughes's contracts. All of the overhead property was accounted for by Hughes as indirect cost items allocated among all of Hughes's then pending contracts, rather than directly to particular contracts. To the extent that Hughes used the overhead property in the performance of the Government contracts, it was reimbursed by the Government. After completion of contract work, any remaining expensed equipment or partitions were sold by Hughes at bid sale, and the proceeds credited back to the Government.

The contracts at issue were either "cost reimbursement" (§ 52.245-5(c)) or "fixed price" (§ 52.232-16(d)) contracts. They specifically and expressly incorporated by reference either the cost-reimbursement contract title clauses or the progress payment title clauses, dependent upon the type of Government contract involved.[4]

C. *FAR.*

There are 53 parts to the FAR. The first 51 parts constitute substantive regulatory law. Part 52 is an appendix with various sample clauses that may

---

[4]For example, the cost-reimbursement contract provided: "This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. [¶] I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES . . . [¶] . . . [¶] 52.245-5 Government Property (Cost Reimbursement, Time and Material, or Labor-Hour Contracts) (JAN 1986) . . . ."

The fixed-price contract provided: "This contract incorporates the following clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. [¶] I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES: . . . [¶] 52.232-16 PROGRESS PAYMENTS (JUL 1991) . . . ."

be used to implement the regulations. Only the segments of part 52 that are incorporated in the contract become the basis of the contract. Part 53 is an appendix of sample forms.

The FAR is organized into parts, subparts, sections, subsections, paragraphs and subparagraphs. The number to the left of the decimal point represents the part number, i.e., part 52.245-5(c) means part 52. Each part begins with a "000" provision, which defines the scope of that part. This is followed by a definitions section, often designated as "101," that contains important definitions to aid the reader in understanding the subsequent regulations of that part. The first number to the right of the decimal point represents the subpart, i.e., part 52.245-5(c) means subpart 2. The second and third digits to the right of the decimal identify the section, i.e., part 52.245-5(c) means section 45. The number to the right of the hyphen is the subsection, i.e., part 52.245-5(c) means subsection 5. Any notations that are in parentheses and follow the section or subsection number represent paragraph and subparagraph numbers. Again, for example, a citation to part 52.245-5(c)(3) refers to FAR part 52, subpart 2, section 45, subsection 5, paragraph c, and subparagraph 3.

 According to Hughes, its contracts that included part 52.245-5 transferred title to the overhead property used in performance of those contracts to the Government.

1. *Cost-reimbursement contracts (§ 52.245-5(c)).*

Pursuant to part 45.106(f) (1998), part 52.245-5 must be incorporated in all cost-reimbursement contracts. Part 52.245-5(c) contains the title clause, which provides that title to property purchased by the contractor vests in the Government if its costs are reimbursable to the contractor. That part states as follows: *"Title.* (1) The Government shall retain title to all Government-furnished property. [¶] (2) Title to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under this contract shall pass to and vest in the Government upon the vendor's delivery of such property. [¶] (3) Title to all other property, the cost of which is reimbursable to the Contractor, shall pass to and vest in the Government upon— [¶] (i) Issuance of the property for use in contract performance; [¶] (ii) Commencement of processing of the property [f]or use in contract performance; or [¶] (iii) Reimbursement of the cost of the property by the Government, whichever occurs first. [¶] (4) All Government-furnished property and all property acquired by the Contractor, title to which vests in the Government under this paragraph (collectively referred to as *'Government property'*), are subject to the provisions of this clause. Title to

Government property shall not be affected by its incorporation into or attachment to any property not owned by the Government, nor shall Government property become a fixture or lose its identity as personal property by being attached to any real property."

To summarize the above, the Government has title to three types of property pursuant to part 52.245-5(c), namely, (1) Government-furnished property; (2) property the contractor purchases for which he is entitled to be reimbursed as a direct item of cost; and (3) all other property, the cost of which is reimbursable to the contractor, such as indirect cost items. Logically, a contractor will not recover any costs for Government-furnished property for the obvious reason that the contractor did not incur any costs in obtaining the property. Equally obvious is the fact that the contractor will be reimbursed for its direct costs, i.e., that property which can be traced to having been purchased directly for use in fulfilling the Government contract. Thus, the third category of property must refer to indirect cost property (overhead property) for which the contractor is also entitled to be reimbursed. By their nature, indirect costs are incapable of being specifically identified with a particular contract.

Hughes was required to disclose to the Government all of its anticipated direct and indirect costs for each Government contract. (§ 30.2 (2001) CAS Program .Requirements.) Because indirect costs, by definition, cannot be identified to each particular contract, Hughes was required to agree in advance on the percentages of its indirect costs allocable to each of its Government and private contracts. (§§ 30.2 & 31.203.) While items of overhead property are not incorporated into identifiable goods sold to the Government, they are purchased by the Government through its reimbursement of the contractor's indirect costs. Part 31.203(b) specifically provides that "[i]ndirect costs shall be accumulated by logical cost groupings with due consideration of the reasons for incurring such costs" which is further augmented by paragraph (d) which states that "[t]he contractor's method of allocating indirect costs shall be in accordance with standards promulgated by the CAS [Cost Accounting Standards] Board . . . ."

According to the parties' stipulations, Hughes calculated the percentage of its indirect costs allocable to each of its Government contracts. Hughes was then reimbursed by the Government for those indirect costs. The "Allowable Costs and Payment" clause at part 52.216-7 establishes the methodology for the submission of the contractor's properly allocated indirect costs so as to be allowable, as well as the mechanism for reimbursement of those indirect costs by the Government. Part 16.307(a)(1) requires the insertion of the "Allowable Costs and Payment" clause in every cost-reimbursement contract. Such clause was included in Hughes's Government contracts. This

clause sets up the submission mechanism procedure for the contractor to invoice its costs incurred so as to receive cost reimbursement payments for its allowable costs. The clause provides the "indirect costs linkage" to the "all other property" provision of part 52.245-5(c)(3).

Part 52.216-7, in relevant part, provides: "(b) *Reimbursing costs*. (1) For the purpose of reimbursing allowable costs . . . the term '*costs*' includes only— [¶] (i) Those recorded costs that, at the time of the request for reimbursement, the Contractor has paid by cash, check, or other form of actual payment for items or services purchased directly for the contract; [¶] (ii) When the Contractor is not delinquent in paying costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for— [¶] . . . [¶] (F) *Properly allocable and allowable indirect costs*, as shown in the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts . . . ." (Italics added.)

Clearly, the above paragraph evidences the Government's obligation to pay for a contractor's allocable and allowable indirect costs when submitted in accordance with the clause's procedures, i.e., the FAR and the CAS. More importantly, it shows that the Government has purchased the indirect property used by the contractor by reimbursing it for its properly allowable and allocable indirect costs. By purchasing the indirect cost property, the Government receives absolute title through the language of part 52.245-5(c)(3) which states that "[t]itle to *all other property*, the *cost of which is reimbursable to the Contractor*, shall pass to and vest in the Government . . . ." (Italics added.)

Part 52.216-7(h) further reinforces the Government's intent to take title under part 52.245-5(c)(3) to indirect cost property that it has purchased through reimbursement of indirect costs as follows: "*Final payment*. [¶] . . . [¶] (2) The Contractor shall pay to the Government any refunds, rebates, credits, or other amounts (including interest, if any) accruing to or received by the Contractor or any assignee under this contract, to the extent that those amounts are properly allocable to costs for which the Contractor has been reimbursed by the Government. . . ." Again, according to the parties' stipulation of facts, Hughes did in fact, credit to the Government the proceeds obtained from the bid sale of any remaining expensed equipment or partitions.

By reading part 52.245-5(c)(3) together with part 52.216-7(b)(1)(ii)(E) and (h)(2), it is clear that title to Hughes's overhead property passed to the Government by virtue of the Government's payment to Hughes to reimburse

it for the monies spent on such property. Having paid Hughes for the overhead property, the Government bought the property and thus acquired title. Upon Hughes's sale of any unused overhead property, the Government logically expected, and was given, credit for the proceeds obtained. The easiest way for the Government to enforce that expectation is to ensure that it acquires title to the property for which it has reimbursed the contractor. It has done so by virtue of the "other property" language found in part 52.245-5(c)(3).

2. *Fixed-price contracts (§ 52.232-16(d))*.

Likewise, Hughes contends that title to its overhead property used in fulfilling the Government fixed-price contracts (which included § 52.232-16) was also transferred to the Government.

Part 52.232-16(d) provides that title to property described in that paragraph vests in the Government upon the date of the contract or when it is allocable or properly charged to the contract. It provides as follows: "(d) *Title*. (1) Title to the property described in this paragraph (d) shall vest in the Government. Vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract. [¶] (2) *Property*, as used in this clause, includes all of the below-described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices. [¶] (i) Parts, materials, inventories, and work in process; [¶] (ii) Special tooling and special test equipment to which the Government is to acquire title under any other clause of this contract; [¶] (iii) Nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment, and other similar manufacturing aids, title to which would not be obtained as special tooling under subparagraph (ii) above; and [¶] (iv) Drawings and technical data, to the extent the Contractor or subcontractors are required to deliver them to the Government by other clauses of this contract. [¶] (3) Although title to property is in the Government under this clause, other applicable clauses of this contract, e.g., the termination or special tooling clauses, shall determine the handling and disposition of the property. [¶] (4) The Contractor may sell any scrap resulting from production under this contract without requesting the Contracting Officer's approval, but the proceeds shall be credited against the costs of performance."

Looking at the above language, Hughes's overhead property clearly falls within the categories of property contemplated. We disagree with the County's contention and the *TRW* court's finding that the above listing is exclusive and not illustrative. We look to the words used in the clause and note

that there are no restrictive words. Had the Government intended to limit the property affected by part 52.232-16(d), it could have stated so by simply using different language. For example, in place of " '*Property*,' as used in this clause, includes all of the below-described items . . ." it could have said, " '*Property*,' as used in this clause, includes *only* the below-described items . . ." or it could have said, " '*Property*,' as used in this clause, includes all of the below-described items . . . , *except as follows* . . . ." Having failed to provide such limiting language, we find the better interpretation of the clause is to say it is illustrative.

Nonetheless, County references part 52.245-2 (highlighted in the brief for amici curiae Counties of Santa Barbara, Alameda, Butte, El Dorado, Fresno, Glenn, Kern, and Solano and County Assessors of the Counties of Santa Barbara, Los Angeles, San Diego and Santa Clara) and argues that that part serves the same function in fixed price contracts as does 52.245-5 in cost reimbursement contracts. County argues that because 52.245-2 contains no reference to any indirect cost property, no indirect cost property passes as a result of this clause.

Part 52.245-2, in relevant part, provides: "(c) *Title in Government property.* (1) The Government shall retain title to all Government-furnished property. [¶] (2) All Government-furnished property and all property acquired by the Contractor, title to which vests in the Government under this paragraph . . . are subject to the provisions of this clause. . . . [¶] (3) Title to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government. [¶] (4) If this contract contains a provision directing the Contractor to purchase material for which the Government will reimburse the Contractor as a direct item of cost under this contract— [¶] (i) Title to material purchased from a vendor shall pass to and vest in the Government upon the vendor's delivery of such material; and [¶] (ii) Title to all other material shall pass to and vest in the Government upon— [¶] (A) Issuance of the material for use in contract performance; [¶] (B) Commencement of processing of the material or its use in contract performance; or [¶] (C) Reimbursement of the cost of the material by the Government, whichever occurs first."

Referring to part 52.245-2, amici curiae argue that "[i]t is illogical that if the specific government title clause for the type of contract does not envision any transfer of indirect cost property, that another clause would do so by indirect reference (see above 52.232-16 discussion)." We disagree for two

reasons. First, both parts 52.232-16 and 52.245-2 are contained in Hughes's fixed-price contracts. Thus, one must not be read to the exclusion of the other. And second, part 52.232-16(d)(2) notes that title to certain property may be acquired pursuant to other clauses of the contract (i.e., part 52.245-2). To the extent that the indirect cost property is not included in part 52.245-2, part 52.232-16 provides for its inclusion.

D. *Relevant Case Law.*

Having stated our interpretation of the FAR parts applicable to the case before us, we now turn to the relevant case law that has been relied upon by the parties to support their positions. Significantly, we note that the *TRW* case stands out as a challenge to the rationale of the cases relied upon by Hughes.

In *TRW, supra,* 50 Cal.App.4th 1703, summary judgment was entered in favor of a Government contractor for recovery of property taxes. The trial court found that title to overhead property, i.e., consumable supplies and material, and low-value office and plant equipment, vested in the Government and was thus immune from taxation. Like this case, the *TRW* case involved both fixed price (§ 52.232-16(d)) and cost reimbursement (§ 52.245-5(c)) contracts. Also, the cost of the overhead property was reimbursed by the Government. On appeal, our colleagues in Division Four of the Second District reversed with directions to enter summary judgment for the county, holding that the overhead property was not property of the Government.

In reaching its decision regarding part 52.245-5 contracts, *TRW* relied primarily on part 45.000 (2001). Part 45.000 defines the scope of part 45 as follows: "This part prescribes policies and procedures for providing Government property[5] to contractors, contractors' use and management of Government property, and reporting, redistributing, and disposing of contractor inventory. It does not apply . . . to property to which the Government has acquired a lien or title solely because of partial, advance, or progress payments; or to disposal of real property." According to *TRW*, "[t]his means that although the title clause found in FAR [part] 52.245-5 is the cost-reimbursement contract, the clause does not apply to certain property—that

---

[5] "Government property is defined as 'all property owned by or leased to the Government or acquired by the Government under the terms of the contract. It includes both Government-furnished property and contractor-acquired property as defined in this section.' (FAR, § 45.101(a).) Contractor-acquired property 'means property acquired or otherwise provided by the contractor for performing a contract and to which the Government has title.' (*Ibid.*) Government-furnished property 'means property in the possession of, or directly acquired by, the Government and subsequently made available to the contractor.' (*Ibid.*)"

for which the [G]overnment has made partial, advance, or progress payments. That is, FAR [part] 52.245-5 cannot be the predicate for a claim of federal ownership of the property if the [G]overnment was making payments to reimburse the contractor for the property." (*TRW, supra,* 50 Cal.App.4th 1703, 1715.)

While the clear language of part 45.000 states that part 45 does not apply to "property to which the Government has acquired a lien or title solely because of partial, advance, or progress payments," the intent of that provision is to make it clear that part 45's property maintenance and management requirements do not apply to *progress payments property.* However, the terms "partial or progress payments" are not synonymous with the interim billing and reimbursement of costs incurred in a cost reimbursement contract. (See § 32.500 (2001).) "This subpart prescribes policies, procedures, forms, solicitation provisions, and contract clauses for providing contract financing through progress payments based on costs. *This subpart does not apply to—* [¶] (a) *Payments under cost-reimbursement contracts,* . . ." (Italics added.)

Also, as noted by an appellate court in Arizona, the *TRW* court's "interpretation of . . . [part] 45.000 unfortunately fails to attend adequately to either the words of the regulation or those of the clause. In a cost type contract, the [G]overnment reimburses the contractor for *every* item of property that the contractor procures for the job. This includes not only overhead items allocated to the contract, but also every item used specifically and exclusively for the contract. The inevitable conclusion from the *TRW* court's reasoning would be that *all* such items are outside the scope of Part 45. Part 45 would thus apply exclusively to items of property that the [G]overnment already owns. It makes no sense to conclude that the only property to which title passes to the [G]overnment is that which it already owns. Moreover, the provisions of Part 45 repeatedly contradict that proposition.

"The *TRW* court also erred in asserting that title passes to the [G]overnment '*solely because of* partial, advance, or progress payments.' [(*TRW, supra,* 50 Cal.App.4th 1703, 1715)] (emphasis added). The court overlooked that title also passes when the property is 'issued for use in contract performance' or when the contractor starts processing the property or using it in performance of the contract. *See* . . . § 52.245-5(c)(3)(i) & (ii). Most of the overhead items involved here were as capable of passing to the [G]overnment under the latter circumstances as under those listed in subsection

(3)(iii).[6] Indeed, as . . . the language of the regulation suggests, the events detailed in subsections (3)(i) through (iii) control only the timing of the passage of title to the [G]overnment. In short, title to property does not pass 'because of' the listed events; it passes 'when' they occur.

"Finally, [the fact that the] overhead items cannot be specifically identified to a single [G]overnment contract[ does not mean that] they are not [G]overnment property and are not subject to the title-passing clause. . . . [Part] 52.245-5(d), provides in part: 'The Government property shall be used only for performing this contract, *unless otherwise provided in this contract or approved by the Contracting Officer.*' (Emphasis added). [As the italicized portion of subsection (d) states, i]tems need not be identifiable to a single contract to constitute [G]overnment property. [The language in part] 45.505-3 (1998) [is] broad enough to include overhead items. The provision states in part:

"(a) *General.* All Government material[7] furnished to the contractor, *as well as other material to which title has passed to the Government by reason of allocation from contractor-owned stores* or purchase by the contractor for direct charge to a Government contract *or otherwise,* shall be recorded in accordance with the contractor's property control system and the requirements of this section.

"(b) *Consolidated stock record.* When a contractor has more than one Government contract under which Government material is provided, a consolidated record for materials may be authorized by the property administrator, *provided, the total quantity of any item is allocated to each contract by contract number and each requisition of material from contractor-owned stores is charged to the contract on which material is to be used.* The supporting document or issue slip shall show the contract number or equivalent code designation to which the issue is charged.

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

6"For example, the items included perishable tools like hammers, drills, screwdrivers, maintenance and repair supplies; office equipment and supplies; glue, solvents, nuts, bolts and screws; laboratory equipment and materials; parts and materials like batteries, resistors, transistors, metal, and plastic that are consumed in operations; and non-capitalized plant equipment like timers, meters, and amplifiers."

7" 'Material' is defined as: [¶] [P]roperty that may be incorporated into or attached to a deliverable end item or that may be consumed or expended in performing a contract. It includes assemblies, components, parts, raw and processed materials, and *small tools and supplies that may be consumed in normal use in performing a contract.* [¶] . . . § 45.301 (1998) (emphasis added)."

"(d) *Use of receipt and issue documents* . . . The property administrator may authorize the contractor to maintain, in lieu of stock records, a file of appropriately cross-referenced documents evidencing receipt, issue, and use of Government-provided material that is issued for immediate consumption and is not entered in the inventory record as a matter of sound business practice. This method of control may be authorized for—

"(1) *Material charged through overhead.* . . ." (Emphasis added). This language confirms our conclusion that the title-passing clause at . . . section 52.245-5 applies to overhead property. *Accord Aerospace[, supra,]* 218 Cal.App.3d 1300, . . ." (*Motorola, Inc. v. Arizona Dept. of Revenue* (1999) 196 Ariz. 137, 142-143 [993 P.2d 1101, 1106-1107] (*Motorola*).)

In *Motorola*, a Government contractor appealed from the Arizona Department of Revenue's (Department) assessment for delinquent taxes against property purchased as indirect cost overhead items (overhead property) allocated to various federal and private contracts. The trial court issued summary judgment in favor of the contractor and the Department appealed. (*Motorola, supra*, 993 P.2d 1101, 1103.) The appellate court affirmed the trial court's decision holding that title to the overhead property passed to the Government under the title-passing clauses of the cost-reimbursement type contracts (§ 52.245-5) and fixed-cost contracts (§ 52.232-16), and thus, resale exceptions to use tax were applicable. (*Motorola, supra*, 993 P.2d 1101, 1109.)

We agree with the *Motorola* court's analysis and thus find the *TRW* court's reasoning misplaced.

In reaching its decision regarding part 52.232-16(d) contracts, the *TRW* court found that the listing of items of property in the four separate categories is exclusive. According to *TRW* "[n]othing in the introductory language suggests that the listing is illustrative. Furthermore, the four subparagraphs contain a detailed listing of various categories of property." (*TRW, supra*, 50 Cal.App.4th 1703, 1718.) As we previously stated, we find the opposite to be the case, i.e., we find the list to be illustrative. Thus, we disagree with *TRW* on this point.

Next, the *TRW* court analyzed whether the overhead property falls within any of the categories listed. In response to the contention that the property fell within the category of " 'materials [and] inventories,' " the *TRW* court stated, "[t]aking all of the categories together, it is clear that property embraced within the meaning of this clause and therefore property belonging

to the [G]overnment is that which is used to produce the item contracted for. The listed items are used to manufacture the items, either as parts, instrumentalities or designs and technical drawings pertinent to the production and operation of the product. This is in contrast to the overhead items at issue in this case, property which includes Post-Its, TRW stationery, toilet paper, and desks. None of these items is material or inventory used to produce the procured items: high-technology space and defense equipment. Instead, these items are the common staples of any ongoing business.

"The apparent purpose of [G]overnment title clauses is to protect the [G]overnment's interest by giving it title to the asset to be acquired and the means by which the asset will be produced, operated or applied. (See FAR, § 32.503-14(a).) The [G]overnment drafted the FAR. Presumably if it wanted to ensure that it acquired title to property such as the everyday overhead items at issue in this case, it would have included the category 'overhead' in the categories listed in FAR part 52.232-16(d). It did not do so. Instead, it set forth categories of property which have one element in common: each is necessary to the production and operation of the subject matter of the contract. We therefore do not construe the phrase 'materials [and] inventories' to include overhead property. Consequently, we conclude, as a matter of law, that the [G]overnment does not gain title to the overhead property because of the progress payments it makes to TRW in the fixed-price contracts." (*TRW, supra*, 50 Cal.App.4th 1703, 1718-1719, fn. omitted.)

Like the *Motorola* court, we are not persuaded by the *TRW* court's interpretation of the terms " 'materials [and] inventories.' " (*Motorola, supra*, 993 P.2d 1101, 1108.) To assume that only materials and supplies that are consumed in doing the physical work necessary to fulfill a Government contract constitute "materials" is "inherently counterintuitive and does not reflect practical reality." (*Ibid.*, referencing fn. 9 in *TRW, supra*, 50 Cal.App.4th 1703, 1719.) The *TRW* court rejected the argument that it should look to the definition of material found in part 45.301 which includes "supplies that may be consumed in normal use in performing a contract." According to *TRW* "reliance upon this definition is unavailing because it takes the definition out of context." (*TRW, supra*, 50 Cal.App.4th 1703, 1719, fn. 9.) In support of its reasoning, *TRW* reiterated its opinion that part 45, of which 45.3 is a subpart, does not apply to property obtained via progress payments. As we previously explained, we find such opinion to be baseless, and thus choose not to follow *TRW*. Instead, we agree with the *Motorola* court's finding that "[t]he term 'materials' may include items consumed in the mental work that guides and underpins the physical work." (*Motorola, supra*, 993 P.2d 1101, 1108.)

Relying upon *Aerospace*, the trial court found that title to Hughes's overhead property vested in the Government. *Aerospace* involved supplies and materials (overhead property) purchased by an aerospace company to help it perform its contracts with the Government for research and development of space and military systems. The Board of Equalization assessed sales and use taxes against the company on its overhead property which had been purchased pursuant to resale certificates and allocated to specific contracts by multiple accounting methods. The terms of the contract included a clause specifying when title to the materials passed to the Government. The company sued for refund of sales and use taxes paid on the overhead material. The trial court found in favor of the company and the appellate court affirmed.

The *Aerospace* court held that the exemption from sales taxes of Revenue and Taxation Code section 6381, applied because the resale of the overhead property to the Government under the contract was included within the statute. (*Aerospace, supra,* 218 Cal.App.3d 1300, 1309.) The court held that no use tax applied because the company's use of the materials occurred after title passed to the Government. (*Id.* at pp. 1309-1310.) It also held that California Code of Regulations, title 18, section 1618, under which the board reached a contrary conclusion, was arbitrary, beyond the board's rulemaking authority, and therefore invalid because it was opposed to judicial precedent that held that title in these circumstances passed according to the terms of the contract. (*Aerospace,* at pp. 1310-1314.)

County criticizes the trial court's reliance on *Aerospace*, arguing that, as *TRW* pointed out, *Aerospace* involved a lawsuit for refund of sales and use taxes paid on overhead property, whereas this case involves an ad valorem tax based upon ownership. Even though different taxes are involved, we see no distinction in the title passage clauses. The primary issue in *Aerospace*, *TRW*, and this case, is ownership of the overhead property, i.e., does title to a contractor's overhead property vest in the Government pursuant to the title-passing clauses included in the Government contracts. The type of tax being assessed against the property is irrelevant to this issue.

We also reject County's argument that the title-passing clauses merely create a security interest. (*Marine Midland Bank v. United States* (Cl.Ct. 1982) 687 F.2d 395; King, *Federal Acquisition Law in an Era of Declining Defense Spending: Defining the Government's Interest in Defense Contractor Property* (1995) 42 Naval L.Rev. 35.) As recognized by *Motorola*, such "position is the minority view in the federal courts. *See McDonnell Douglas Corp. v. Director of Revenue,* 945 S.W.2d 437, 441 (Mo. 1997) ('[S]ecurity

interest theory . . . has yet to be adopted as a majority view by the federal courts.'). Like the court in *McDonnell Douglas*, we feel 'no compulsion at this time to ignore the plain meaning of the title vesting provisions included in the federal contracts at issue in this case.' *Id.* at 411." (*Motorola, supra*, 993 P.2d 1101, 1108; see also *General Dynamics Corp. v. County of L.A., supra*, 51 Cal.2d 59, 67-71.)

Having found that title to Hughes's overhead property vested in the Government, we must conclude that the overhead property was not subject to County's ad valorem tax. (*General Dynamics Corp. v. County of L.A., supra*, 51 Cal.2d 59.)

CONCLUSION

Hughes is a Government contractor doing business in County. County assessed Hughes's overhead property as Hughes's property without regard to allocation between the qualifying Government contracts and nonqualifying contracts. Hughes paid taxes on the overhead property and applied for a refund claiming that a portion of the taxes paid on the overhead property should be excluded from assessment because title resided with the Government. The parties have stipulated to the percentage of Hughes's costs to purchase the overhead property, which costs were incurred in performing qualifying Government contracts.

Moreover, the parties stipulated that the overhead property in this case was consumed or used in the performance of qualifying Government contracts. All of the subject supplies, expensed equipment and partitions were accounted for by Hughes as overhead, i.e., as indirect cost items allocated among all of Hughes's then pending contracts, rather than directly to particular contracts. Pursuant to its contracts with the Government, Hughes was reimbursed by the Government for that portion of the supplies, expensed equipment and partitions used in the performance of the Government contracts. After completion of contract work, any remaining expensed equipment or partitions were sold by Hughes at bid sale, and the proceeds credited back to the Government.

Given the parties' stipulation of facts, we were called upon to only determine whether the title provisions in parts 52.245-5 and 52.232-16 vest title to Hughes's overhead property in the Government. After consideration of *Aerospace* and *Motorola*, we conclude that they do.

## DISPOSITION

The judgment is affirmed.

Richli, J., and Gaut, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 15, 2002. Kennard, J., was of the opinion that the petition should be granted.