[No. B172863. Second Dist., Div. Two. Nov. 28, 2005.]

NORTHROP GRUMMAN CORPORATION, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES, Defendant and Appellant.

**COUNSEL**

Bewley, Lassleben & Miller, Jeffrey S. Baird, Joseph A. Vinatieri, Kevin P. Duthoy and Jason C. DeMille for Plaintiff and Appellant.

Raymond G. Fortner, Jr., County Counsel, and Albert Ramseyer, Deputy County Counsel, for Defendant and Appellant.

**OPINION**

**BOREN, P. J.**—The County of Los Angeles assessed ad valorem property taxes on personal property allocated by a military defense contractor to the performance of its fixed-price contracts with the United States government. The progress payment clause of the federal contracts states that title to property allocable or chargeable to the contracts vests in the federal government. The county interprets this to mean that the United States takes a lien or security interest in the contractor's property. We disagree with the county's interpretation. Title means title. Title does not mean lien. Because the county cannot tax property owned by the United States, it must refund the taxes paid by the contractor on property allocated to the performance of its military contracts.

## FACTS[1]

Northrop Grumman Corporation (Northrop) is a Los Angeles County (County) contractor primarily engaged in the business of designing and building military aircraft and weapons systems for the United States government. It also manufactures commercial aircraft. Northrop uses four categories of personal property in its business: perishable tools, minor equipment, supplies, and technical books.[2]

During the tax years in question, 1987 through 1995, Northrop's personal property (i.e., its tools, minor equipment, supplies and technical books) was accounted for as an indirect (overhead) cost, which was allocated among all of Northrop's contracts in accordance with generally accepted accounting principles. Northrop exercised sole discretion regarding the type of tools, equipment, supplies and books it procured, and maintained sole possession of them. At times, tools and supplies used by Northrop in the performance of both government and commercial contracts may have been commingled. For example, personnel on assembly lines in Hawthorne may have interchanged tools among the 747 commercial aircraft and F-18 fighter aircraft projects, because the tools, equipment and supplies used in both assembly lines were physically indistinguishable.

---

[1] The parties stipulated to the facts underpinning this lawsuit.

[2] "Perishable equipment" includes bolts, cloths, adapters, batteries, bits, blades, brushes, clamps, dyes, drills, fasteners, files, flashlights, gauges, hammers, knives, mallets, wrenches, and so on. "Minor equipment" covers office equipment, machinery, and factory equipment. "Supplies" encompass materials on hand that do not enter directly into finished products but are necessary for day-to-day work, such as pens, paper, safety equipment, paint, chemicals, oils, acids, adhesive, tape, gloves, towels, and so on. "Technical books" include government or aerospace industry publications used by Northrop to perform its contracts.

Northrop believes, and the County disputes, that part of Northrop's personal property is owned by the United States government and is therefore exempt from property taxes. Northrop did not request a "proof of exemption" from the federal government, nor was one provided. Nevertheless, it is undisputed that Northrop designed, fabricated and delivered military aircraft to the federal government under hundreds of fixed-price contracts during the relevant tax years. The fixed-price contracts contain a clause providing for progress payments.

Northrop filed numerous claims with the County seeking a refund of taxes it paid on its personal property. In itemized refund claim calculations, Northrop identified the percentage of its personal property allocable to the performance of its military contracts with the federal government. Northrop's total refund request for the tax years 1987 to 1995 is $2,268,451. The County denied Northrop's refund claims.

In 2002, Northrop filed suit against the County, demanding payment of its tax refund. The dispute was tried by the court, which gave judgment to Northrop. The County has appealed from the judgment and Northrop has cross-appealed to challenge the court's computation of prejudgment interest. The appeals are timely.

## DISCUSSION

### *The County's Appeal*

1. *Appeal and Review*

Appeal lies from the judgment. (Code Civ. Proc., § 904.1, subd. (a)(1).) The classification of items as taxable or nontaxable presents a question of law that is reviewed independently on appeal. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) "Taxation must, of course, be uniform and the tax law uniformly applied. [Citation.] Uniformity depends on proper classification. And proper classification is furthered through the application of independent review." (*Id.* at pp. 888–889.) The construction of contracts to which the United States is a party, the effect of the contracts on the rights and obligations of the signatories, and the titles or liens created by the contracts present questions of federal law. (*U.S. v. Allegheny County* (1944) 322 U.S. 174, 183 [88 L.Ed. 1209, 64 S.Ct. 908].)

2. *Extent of the County's Right to Levy on a Federal Contractor's Property*

The County is generally entitled to assess levies on taxable property. (Rev. & Tax. Code, § 405; *General Dynamics Corp. v. County of L.A.* (1958)

51 Cal.2d 59, 63–66 [330 P.2d 794].) The County is not, however, entitled to collect taxes on property owned by the federal government: the United States is immune from direct state and local taxation. (*United States v. California* (1993) 507 U.S. 746, 753 [123 L.Ed.2d 528, 113 S.Ct. 1784]; *McCulloch v. Maryland* (1819) 17 U.S. 316, 436 [4 L.Ed. 579].) "[T]he Government's property interests are not taxable either to it or to its bailee. The 'Government' is an abstraction, and its possession of property largely constructive. Actual possession and custody of Government property nearly always are in someone who is not himself the Government but acts in its behalf and for its purposes. He may be an officer, an agent, or a contractor. His personal advantages from the relationship by way of salary, profit, or beneficial personal use of the property may be taxed as we have held. But neither he nor the Government can be taxed for the Government's property interest." (*U.S. v. Allegheny County, supra,* 322 U.S. at pp. 187–188.)

■ Thus, the federal immunity from state taxes may extend to a federal contractor. "[W]here the federal government receives title to property pursuant to the provision of its contract with a civilian contractor, any use of the property made by the contractor in performing the contract after title has passed to the government under the terms of the contract is deemed to have been made on behalf of the government and such use therefore is not taxable." (*Aerospace Corp. v. State Bd. of Equalization* (1990) 218 Cal.App.3d 1300, 1309–1310 [267 Cal.Rptr. 685]; see *Lockheed Aircraft Corp. v. State Bd. of Equalization* (1978) 81 Cal.App.3d 257, 266–267 [146 Cal.Rptr. 283].)

In sum, ad valorem property taxes cannot be imposed if the property belongs to the federal government, not the contractor. However, an ad valorem property tax can be imposed on property belonging to the federal contractor and not to the federal government. (*TRW Space & Defense Sector v. County of Los Angeles* (1996) 50 Cal.App.4th 1703, 1713–1714 [58 Cal.Rptr.2d 602] (*TRW*); *Hughes Aircraft Co. v. County of Orange* (2002) 96 Cal.App.4th 540, 545 [117 Cal.Rptr.2d 601] (*Hughes*).) With respect to federal contractors, government property is " ' "all property owned by or leased to the Government or acquired by the Government under the terms of the contract. It includes both Government-furnished property and contractor-acquired property as defined in this section." [Citation.] Contractor-acquired property "means property acquired or otherwise provided by the contractor for performing a contract and to which the Government has title. . . ." [Citation.]' " (*Hughes, supra,* 96 Cal.App.4th at p. 552, fn. 5, quoting the Federal Acquisition Regulation (FAR), 48 C.F.R. § 45.101(a).)

### 3. *Federal Title: Ownership or Security Interest in Northrop's Property?*

■ Northrop's contracts with the federal government are fixed-price contracts. In these contracts, the agreed consideration is fixed and the work is financed by the government with progress payments based on the contractor's periodic invoices. (48 C.F.R. § 52.232-16.) The question raised by the County is whether, under a fixed-price contract with progress payments, the federal government takes *title* to the contractor's personal property, or merely takes a *lien or security interest* in the contractor's personal property.

■ The contracts between the United States and Northrop state, on their face, that the federal government takes title to specified portions of Northrop's personal property. The progress payment clause reads, "(d) Title. (1) Title to the property described in this paragraph (d) shall vest in the Government. Vestiture shall be immediately upon the date of this contract, for property acquired or produced before that date. Otherwise, vestiture shall occur when the property is or should have been allocable or properly chargeable to this contract."[3] Identical language appears in the FAR, 48 Code of Federal Regulations part 52.232-16(d). "The FAR sets forth the Government's policies with respect to progress payments. Progress payments are made on the basis of costs incurred by the contractor as work progresses under the contract. Upon contract formation, or as property becomes allocable to a contract, title vests in the Government. The Government takes title to parts, materials, inventories, work in progress, special tooling, nondurable tools, and drawings and technical data developed as part of the contract." (Sainsbury, *Seeking One Rule to Bind Them: Unifying the Interpretation and Treatment of the "Title-Vesting" Language of the Progress Payments Clause* (2003) 32 Pub. Cont. L.J. 327, 335, fns. omitted.)

For nearly 100 years, the courts have confirmed that the federal government takes title to its contractors' property in exchange for progress payments. In 1910, the Supreme Court held that progress payments to a shipbuilder vested title to the contractor's property in the federal government, as provided in the federal contract. (*United States v. Ansonia Brass & Copper Co.* (1910) 218 U.S. 452, 466–467 [54 L.Ed. 1107, 31 S.Ct. 49].) The plain and literal language of the contractual title-vesting clause was likewise enforced in *In re Read-York* (7th Cir. 1945) 152 F.2d 313, 316; *In re American Boiler Works* (3d Cir. 1955) 220 F.2d 319, 320–321; *Shepard Engineering Company v. United States* (8th Cir. 1961) 287 F.2d 737, 741; and *General Dynamics Corp. v. County of L.A., supra,* 51 Cal.2d at pages 69–71.

---

[3] The specific property covered by paragraph (d) of the contract is discussed in part 4, *post.*

■ More recently, Congress underscored the title-passing effect of fixed-price contracts by adding supportive language to the National Defense Authorization Act for Fiscal Year 1998. (Pub. L. No 105-85 (Nov. 18, 1997) div. A, tit. VIII, subtit. A (Amendments to General Contracting Authorities, Procedures, and Limitations) § 802, 111 Stat. 1831.) Reconfirming the validity of the title-passing provisions of the FAR, the new statutory language declares that title to a military contractor's property shall vest in the federal government if the contractor receives progress payments. It states that an agency may make progress payments or other payments under contracts for property or services. If the contract "provides for title to property to vest in the United States, the title to the property shall vest in accordance with the terms of the contract, regardless of any security interest in the property that is asserted before or after the contract is entered into." (10 U.S.C. § 2307(h).)

The federal courts have generally resisted the notion that the government's interest in a contractor's work in progress was in the nature of a lien or security interest, rather than an ownership interest. Early cases rejecting the security interest argument include *Boeing Company v. United States* (Ct.Cl. 1964) 168 Ct.Cl. 109, 338 F.2d 342, 345–346, and *In re Double H Products Corporation* (3d Cir. 1972) 462 F.2d 52, 55–57.

In 1982, the federal Court of Claims took an entirely new tack and declared that the federal government takes a lien interest, not title, to its contractors' property. In *Marine Midland Bank v. United States* (Ct.Cl. 1982) 231 Ct.Cl. 496 [687 F.2d 395] (*Marine Midland*), a case that the County relies upon in support of its position, the court characterized the government's progress payments as "loans" to the contractor, with no incidence of government ownership. The government took only a security interest in the contractor's inventory, the court reasoned, which "was far less than full ownership." (*Id.* at p. 398.) The reasoning of *Marine Midland* represents a departure from the case law that preceded it.

■ As one court has observed, "A respectable body of law criticizes the reasoning of *Marine Midland* and holds that, when, under a title vesting clause, a government contractor acquires property allocable to the contract or its completion, government obtains absolute title to the property and subsequent liens cannot be asserted against that property to defeat the government's interest . . . ." (*First National Bank of Geneva v. United States* (Ct.Cl. 1987) 13 Cl.Ct. 385, 387.)[4]

---

[4] Among the cases criticizing *Marine Midland* as being wrongly decided are *In re American Pouch Foods, Inc.* (7th Cir. 1985) 769 F.2d 1190, 1195–1196 [under title-vesting provisions in a progress payment contract, the federal government is entitled to immediate possession of materials used by a defaulting contractor which produced meals-ready-to-eat for the military]; *In re Economy Cab and Tool Co., Inc.* (Bankr. D.Minn. 1985) 47 B.R. 708, 711, fn. 3; *In re*

A literal reading of the title-vesting provision is particularly compelling in the context of military contracts, when the contracted-for goods are needed for national defense. (*In re Coated Sales, Inc.* (Bankr. S.D.N.Y. 1988) 112 B.R. 560, 562.) Northrop manufactures military jets and weapons systems for the United States. If Northrop or another defense contractor were to declare bankruptcy or otherwise terminate operations, essential military production could be jeopardized, potentially for years, while the federal government, creditors, shareholders, and a bankruptcy trustee squabble over the assets that the contracting business uses to produce the items needed for national defense.[5] A literal reading of the title-vesting clause affords the federal government protection from detrimental protracted litigation over war material because absolute title is superior to the interests claimed by secured creditors or bankruptcy trustees.

■ We shall not follow *Marine Midland*, and instead follow the majority rule that the United States takes title to all property used in the performance of federal defense contracts under the title-vesting clause. First, in 1910, the Supreme Court interpreted the clause to confer title on the federal government in *United States v. Ansonia Brass & Copper Co., supra*, 218 U.S. 452. Second, the contractual language, on its face, confers title, not a mere security interest. Third, in 1998, Congress declared that title to a federal armed forces contractor's property does, in fact, vest in the federal government if the contractor receives progress payments. (10 U.S.C. § 2307(h).) Presumably, Congress was aware of the 1982 *Marine Midland* case and intended to abrogate its holding by enacting a statute that expressly confers *title*, not a mere *lien*. ■ When Congress has yet to enact a law, it is the role of the federal courts "to fashion the governing rule of law according to their own standards." (*Clearfield Trust Co. v. U.S.* (1943) 318 U.S. 363, 367 [87 L.Ed. 838, 63 S.Ct. 573].) Congress has now spoken, and it did not adopt the rule fashioned in *Marine Midland*. Neither do we.

### 4. *Northrop's Personal Property (Overhead) Is Federal Property*

The County maintains that "business sundries" purchased by Northrop are not exempt from property taxes. The County reasons that such property is not traceable to or earmarked for a specific government contract; therefore, it is Northrop's property and is taxable. Northrop counters that all of the overhead material that the County seeks to tax is nontaxable federal property because it was allocated to federal contracts.

*Reynolds Mfg. Co.* (Bankr. W.D.Pa. 1986) 68 B.R. 219, 223–224; *McDonnell Douglas v. Director of Revenue* (Mo. 1997) 945 S.W.2d 437, 441.)

[5] In the case of *In re American Pouch Foods, Inc., supra,* 769 F.2d 1190, for example, five years of bankruptcy litigation were needed before the government succeeded in asserting ownership and possession of a defaulting defense contractor's materials.

■ Under 48 Code of Federal Regulations part 52.232-16(d) (2004) and the terms of Northrop's contracts, the government takes title to the contractor's "property." Property "includes all of the below-described items acquired or produced by the Contractor that are or should be allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices. [¶] (i) Parts, materials, inventories, and work in process; [¶] (ii) Special tooling and special test equipment to which the Government is to acquire title under any other clause of this contract; [¶] (iii) Nondurable (i.e., noncapital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment, and other similar manufacturing aids, title to which would not be obtained as special tooling . . . ; and [¶] (iv) Drawings and technical data, to the extent the Contractor or subcontractors are required to deliver them to the Government by other clauses of this contract."[6]

In *Aerospace Corp. v. State Bd. of Equalization, supra,* 218 Cal.App.3d 1300, the issue was whether title passed to the federal government for overhead materials charged to the government as an indirect cost. The materials included batteries, hammers, drills, stationery and janitorial supplies purchased by Aerospace Corp. The court held that because title to this overhead material passed to the government in accordance with the contract, it was not subject to sales and use taxes. (*Id.* at pp. 1309–1310.)

The County relies primarily on an opinion from Division Four of this district, which allowed taxation of a federal contractor's overhead property. (*TRW, supra,* 50 Cal.App.4th 1703.) The court in *TRW* determined that the only portion of the contractor's property belonging to the federal government "is that which is used to produce the item contracted for," such as "parts, instrumentalities or design and technical drawings pertinent to the production and operation of the product." (*Id.* at p. 1718.) However, the court continued, overhead items such as Post-It notes, stationery, toilet paper, and desks are not used to produce the contracted-for items and are therefore not government property. (*Id.* at pp. 1718–1719.)

The court's reasoning in *TRW* has been criticized and rejected in this state and elsewhere. No court has followed *TRW. TRW* was rejected by the Fourth District in *Hughes, supra,* 96 Cal.App.4th 540. There, the court noted that overhead items " 'need not be identifiable to a single contract to constitute [G]overnment property' " under the title-passing clause. (*Hughes,* at p. 554.) Thus, title to such personal property as materials consumed in the production

---

[6] "Material" is property incorporated into an end-product or consumed or expended in performing a contract. It includes parts, components, small tools "and supplies that may be consumed in normal use in performing a contract." (48 C.F.R. § 45.301 (2004).)

process, general office supplies, equipment and office partitions, allocable to the government, vested in the government. The court determined that the allocable property listed in the FAR (48 C.F.R. § 52.232-16(d)) was nonexclusive, so overhead items were not excluded even if not expressly mentioned in the FAR. (*Hughes,* at pp. 550–551.) Similarly, an appeals court in Arizona concluded that a federal contractor could not be assessed for delinquent taxes on items purchased as indirect cost (overhead) property allocated to various federal and private contracts. The court held that title to these items passed to the government under fixed-price contracts. (*Motorola, Inc. v. Arizona Dept. of Revenue* (Ariz.Ct.App. 1999) 196 Ariz. 137 [993 P.2d 1101, 1106–1107].)[7]

In a recent Texas case, a military defense contractor purchased many different items of tangible personal property in performing its contracts. Some items were directly tied to a particular contract; other items such as office supplies were indirect overhead costs charged across multiple government and private contracts. (*Strayhorn v. Raytheon E-Systems, Inc.* (Tex.App. 2003) 101 S.W.3d 558, 564–565.) The dispute was whether the state could impose a sales tax on Raytheon's purchase of overhead items charged as indirect costs to government contracts. (*Id.* at p. 565.) The court concluded that "the government obtains title to overhead items charged as indirect costs to government contracts at the time the costs are allocated to the contracts," a rule that extends to "pencils and other office supplies." (*Id.* at pp. 566–567.)

We shall follow the better reasoned decision in *Hughes,* and decline to follow the *TRW* case. We conclude that overhead property allocated to government contracts as an indirect cost becomes the property of the federal government and is therefore not taxable.

## *Northrop's Cross-appeal*

The trial court awarded Northrop prejudgment interest beginning upon the dates that Northrop filed tax refund claims. In its cross-appeal, Northrop argues that it is entitled to prejudgment interest commencing on the date it made each tax payment to the County. The County contends that interest did not start accruing until Northrop filed refund claims.

---

[7] The overhead items included parts (e.g., batteries), materials (e.g., metal, plastics), low-value plant equipment (e.g., timers, meters, amplifiers), perishable tools (e.g., hammers, drills, screwdrivers), office equipment (e.g., typewriter stands, card files), office supplies (e.g., stationery, paper clips), and other miscellaneous items (e.g., glue, nuts, bolts, etc.), and even employee awards, plaques and cakes served at employee functions. (*Motorola, Inc. v. Arizona Dept. of Revenue, supra,* 993 P.2d at pp. 1103–1104.)

A taxpayer who challenges the imposition of a property tax has two administrative remedies available. One remedy is to apply for an assessment reduction (an assessment appeal) under Revenue and Taxation Code section 1603. The other remedy is to file a claim for a refund under Revenue and Taxation Code section 5096 et seq. Filing a claim for a refund is a prerequisite to pursuing a refund action. (Rev. & Tax. Code, § 5142.) Northrop elected to file a claim for a refund, but did not apply for an assessment reduction.

The parties agree that a taxpayer is ordinarily required to apply for an assessment reduction to receive full prejudgment interest from the date the tax was paid. (Rev. & Tax. Code, § 5151, subd. (c)(1)(A), (c)(3).)[8] Though Northrop did not apply for an assessment reduction, the company argues that it is nevertheless entitled to full prejudgment interest because of a factual stipulation made by the County. The stipulation reads, "The refund claims . . . were timely filed with County in accordance with Revenue and Taxation Code section 5097(a)(2). Northrop exhausted its administrative remedies with respect to each refund claim." Northrop interprets this to be an admission by the County that Northrop exhausted its remedies as to an assessment reduction application.

Northrop's reading of the stipulation is too broad. The County only agreed that Northrop exhausted its administrative remedies with respect to "each refund claim." The County did not stipulate that Northrop exhausted its remedies with respect to any application for an assessment reduction. As a fallback argument, Northrop asserts that it would have been futile to pursue an application for an assessment reduction with the County because the County lacked jurisdiction to consider the type of claim being made by Northrop. (See *TRW, supra,* 50 Cal.App.4th at p. 1710.)

The problem for Northrop is that the award of prejudgment interest is purely statutory, and there is no statute authorizing interest from the date the tax is paid when the taxpayer pursues a claim for a refund. The only statutory authorization for the interest Northrop desires occurs when the taxpayer pursues an assessment reduction, which Northrop did not or could not do. As a result, Northrop is limited to collecting interest from the date it filed its claim for a refund, as the trial court correctly found.

---

[8] "(c)(1) The interest computation period shall commence with the date of payment of the tax when any of the following apply: (A) A timely application for reduction in an assessment was filed . . . (3) In all other cases the interest computation period shall commence on the date of filing a claim for refund . . . ." (Rev. & Tax. Code, § 5151.)

## DISPOSITION

The judgment is affirmed.

Doi Todd, J., and Ashmann-Gerst, J., concurred.

The petition of appellant County of Los Angeles for review by the Supreme Court was denied February 22, 2006, S140304.